968 A.2d 552

### The MARYLAND–NATIONAL CAPITAL PARK AND PLANNING COMMISSION

v.

### TOWN OF WASHINGTON GROVE, Maryland.

**No. 55, Sept. Term, 2008.**

Court of Appeals of Maryland.

March 12, 2009.

Reconsideration Denied May 1, 2009.

**40**

Adrian Robert Gardner, General Counsel (William C. Dickerson, Associate General Counsel, and Jared M. McCarthy, Associate General Counsel, The Maryland-National Capital Park and Planning Commission, Riverdale), on brief, for Appellant/Cross–Appellee.

William J. Chen, Jr. (Chen, Walsh, Tecler & McCabe, LLP, Rockville; William J. Roberts, Poolesville), on brief, for Appellee/Cross–Appellant.

Susan Silber, Kenneth Sigman, Silber, Perlman, Sigman & Tilev, P.A., Takoma Park, Robert Manzi, Knight, Manzi, Nussbaum & LaPlaca, P.A., Upper Marlboro, Brief of the Maryland Municipal League, Amicus Curiae, in Support of the Town of Washington Grove, Appellee and Cross Appellant.

Argued Before BELL, C.J., HARRELL, GREENE, MURPHY, ADKINS, BARBERA, and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

HARRELL, Judge.

This fracas over *lebensraum* is essentially between the Maryland–National Capital Park and Planning Commission ("MNCPPC"), an agency of the State of Maryland exercising "planning" and "park" functions in most of Montgomery and Prince George's Counties, Md.Code, Art. 28 (1957, 2003 Repl. Vol. & Supp.2008), and the Town of Washington Grove ("Town"), a municipal corporation located in Montgomery County. They joust here over the right to possess a parcel of real property adjacent to a boundary of the Town of Washington Grove. The MNCPPC posits its claim to the property on a purported "Legacy Open Space" ("LOS") dedication from the current owner of the parcel, Toll MD II, LLC ("Toll"), as part of Toll's subdivision development proposal for a tract of which the parcel is a part. The Town proposes to acquire the property by condemnation.

Lurking within this dispute is the issue, among others, of the Town's authority to condemn property lying outside its municipal boundary; however, that question will have to wait to receive our attention, if at all, for another day. For reasons to be explained, we shall reverse the judgment of the Circuit Court for Montgomery County with respect to its denial of the MNCPPC's motion to intervene as of right in the condemnation action initiated by the Town against Toll, and remand the case to the Circuit Court for further proceedings not inconsistent with this Opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On 14 September 2001, Toll, by its predecessor-in-interest, Oxbridge Development at Washington Grove, L.C., filed an application with the Montgomery County Planning Board ("Planning Board") of the MNCPPC seeking approval of a preliminary plan of subdivision for a 66.59 acre tract of residentially-zoned land located in Montgomery County. The application was designated as Preliminary Plan No. 1–02022. The proposed development was named the "Casey Property at

Mill Creek." On 11 July 2005, the Planning Board approved Preliminary Plan No. 1–02022, with conditions.

A part of the 66.59 acres is a parcel, approximately 12 acres in size, which lies "adjacent to, and outside of, the corporate limits" of the Town. The Planning Board's approval of the subdivision plan refers to this parcel as the "LOS Parcel." The LOS Parcel is an "open field" or "meadow" which, in the Planning Board approval of Preliminary Plan No. 1–02022, was determined "to provide a valuable buffer to the significant heritage resource that is the Town of Washington Grove." The LOS Parcel is addressed by the Montgomery County Legacy Open Space Functional Master Plan,[1] and was listed, in Toll's subdivision plan, as a Class II Heritage Resource. According to the Planning Board's approval, "[t]he meadow enhances the setting of the Town, designated a National Register historic site, by maintaining the [T]own's rural character." The approval described the LOS Parcel as significant according to several Legacy Open Space criteria, including:

(a) The property has countywide and national significance in terms of its association with the Town of Washington Grove, a heritage resource of national import with exceptional architectural character and rural viewscapes.

(b) Because of its association with Washington Grove, the site contributes to the Legacy program's heritage theme of the Rail Community Cluster, of which the Town is a part.

(c) If preserved as open space, the site would serve as a protective buffer of the significant heritage resource that is Washington Grove. Over 57% of the Town is preserved as forest today, and the preservation of this open field would

---

1. The Legacy Open Space Functional Master Plan ("LOS Master Plan") was approved by the County Council for Montgomery County, sitting as the District Council for the Maryland–Washington Regional District for that portion of that district within Montgomery County, by Resolution No. 14–97C, adopted 24 July 2001. As the Master Plan states, the "combination of urban open spaces, green boulevards, and regional parks provides an important community building element within Montgomery County, and directly contributes to community livability and character."

preserve a rural viewscape on the last remaining unprotected side of the Town.

The 11 July 2005 Planning Board approval acknowledges that approximately four years of negotiations had taken place, in particular between Toll and the Town, to preserve the LOS Parcel "as parkland" to "ensure[ ] compatibility between the Town and the new development" and "enhance[ ] the preservation of the rural character of Ridge Road." In particular, the approval cites the testimony of the Town's Mayor, who participated in public hearings in December 2004 held by the Planning Board regarding the subdivision plan proposal, proclaiming that the Town's "overriding concern was to ensure the protection of the 13–acre Legacy Open Space parcel to provide a buffer between the new project and the existing Town communities." The Board also heard the testimony of members of preservation organizations and Town residents who collectively voiced the view that the "meadow was critical to the long-term protection of the Town as a historic resource."

In its approval of the subdivision plan, the Planning Board [2] included 28 "Conditions of Approval." Of particular relevance to the case at hand is Condition 15, which states:

Within the earlier of 24 months of the issuance of the [approval] for Preliminary Plan 1–02022 or the recordation of the initial plat of Phase I, Applicant to dedicate to [the MNCPPC] the area shown on the plan as "Legacy Open Space Natural Area" totaling approximately 12 acres.

Thus, Toll was required to dedicate the LOS Parcel in order to obtain approval and recordation of the initial final plat of subdivision for development of the 66.59 acre project, if Toll wished to pursue development pursuant to Preliminary Plan

---

2. At the apex of the MNCPPC organizational hierarchy is a ten member commission—five representing Montgomery County and five representing Prince George's County—regarding bi-county affairs. The five Montgomery County members convene separately as the "Montgomery County Planning Board," with responsibility for "planning, platting, and zoning functions," and other designated land use matters relating exclusively to Montgomery County. *See* Md.Code, Art. 28 § 7–111 (1957, Repl.Vol.2003 & Supp.2008).

No. 1–02022. *See* Md.Code, Art. 28 § 7–107 (1957, 2003 Repl.Vol. & Supp.2008); Montgomery County Code ("County Code"), Ch. 50 ("Subdivision of Land") (2008).[3]

---

**3.** Montgomery County Code, § 50–35(h) provides for a duration of validity period for approved preliminary plans, ranging from 36 months to 5 years (including discretionary extensions obtained from the Planning Board), depending upon how many phases of development the preliminary plan proposes and whether certain dedications to the County are included. County Code, § 50–35(h)(2) provides specifically:

(2) *Duration of Validity Period.*

(A) An approved preliminary plan for a single phase project remains valid for 36 months from its Initiation Date. Before the validity period expires, the applicant must have secured all governmental approvals necessary as condition precedent for plat recordation and a final record plat for all property delineated on the approved preliminary plan must have been recorded among the County Land Records.

(B) An approved preliminary plan for a multi-phase project remains valid for each period of time established in the phasing schedule approved by the Planning Board. Each phase must be assigned a validity period, the duration of which must be proposed by the applicant as part of an application for preliminary plan approval or an application for preliminary plan revision or amendment, reviewed by staff, and approved on a case-by-case basis by the Planning Board, after considering such factors as the size, type, and location of the project. The time allocated to a phase must not exceed 36 months from the initiation date associated with that particular phase. The cumulative validity period of all phases may not exceed the APFO [Adequate Public Facilities Ordinance] validity period which runs from the date of the initial preliminary plan approval including any extensions granted under Section 50–20(c)(5). Validation of a preliminary plan for a phase occurs upon the recordation of a final record plat for all property delineated in that particular phase of the approved preliminary plan.

(C) The applicant must propose a phasing schedule before the Planning Board acts on the preliminary plan or site plan, if applicable.

(D) An approved preliminary plan for a multi-phase project that includes land or building space to be conveyed or dedicated to the County for an arts or entertainment use under Section 59–C–6.2356 is validated for all phases of the approved preliminary plan by recordation of a final record plat for all property in the phase containing the land or building space to be conveyed or dedicated to the County for an arts or entertainment use if recordation occurs within 5 years after the final approval of the preliminary plan. After approval, an amendment or modification to the phasing plan or the preliminary plan will not affect the validations, if the requirements of this subsection have otherwise been met.

The Planning Board mailed notice of the 11 July 2005 subdivision approval to parties of record who appeared and participated in its proceedings. The parties of record included the Town and the applicant/developer of the development at the time, an entity known as "Oxbridge Development at Washington Grove, L.C."[4] Neither the Town nor any other party of record elected to pursue judicial review of the Plan-

---

County Code, § 50–35(h)(3)(A)–(D) provide for the applicant's ability to seek an extension of the validity period, and the criteria under which the Planning Board must review such extensions. If an applicant fails to validate timely the approved preliminary plan or to secure an extension in lieu of such, County Code, § 50–35(h)(3)(E) provides:

(E) *Effect of Failure to Timely Validate Plan or Secure an Extension.*

(i) If a preliminary plan is not timely implemented in whole or in part prior to the expiration of the validity period, the remaining portion of such plan not then validated also expires. Similarly, the failure on the part of an applicant to timely validate a phase, in whole or part, voids the balance of the preliminary plan approval for that phase and all subsequent phases not yet validated.

(ii) In those instances where an applicant has timely validated only a portion of a plan and no extension is granted, the applicant seeking to develop only that portion of the project remains responsible for fully complying with all of those terms, conditions, and other requirements associated with the portion of the plan approval that has been implemented.

(iii) If a preliminary plan or portion thereof is not timely validated, any APFO determination made by the Planning Board associated with the expired portion of the preliminary plan also expires. In such event the applicant loses any further rights to claim any trips associated with the expired APFO approval. The filing of a new preliminary plan would not lay the basis for reclaiming trips lost by termination of the APFO approval.

(iv) A project that is not timely validated may also cause a preliminary plan approval conditionally linked to such project plan approval to simultaneously expire.

Section 50–35(h)(E)(4) further provides that the Planning Board may, by resolution, revoke approval of a preliminary plan

upon a finding by the Board that any conditions attached to the approval of such preliminary plan have become inapplicable or that the plan itself has been rendered impractical by reason of an amendment or addition to the general plan or any portion thereof, or by a proposed public improvement which conflicts with such plan or other conditions or circumstances which involve injury or damage to the public health, safety or welfare.

4. Oxbridge Development at Washington Grove, L.C. is the immediate predecessor in title to Toll.

ning Board's action.[5]

On 6 September 2005, the Town Council of Washington Grove adopted its Resolution No. 2005–06 authorizing the institution by the Town of an eminent domain action in the Circuit Court to acquire the LOS Parcel. The Resolution explains that the Town's interest in acquiring the LOS Parcel by means of condemnation was due to the fact that members of the County Council had pressured the Planning Board to delay approving Preliminary Plan No. 1–02022, and in particular the dedication of the LOS Parcel, because the County Council was considering using the LOS Parcel as the site of a public school. The Resolution states the Town Council's belief that instituting the condemnation action was necessary to ensure that "the LOS remains a public park and recreational resource in a natural state and also continues to afford protection to the historic character of the Town into the future as intended by the Planning Board" when it approved Preliminary Plan No. 1–02022. The Town Council believed that "the surest means to achieve [its] goals is [for] ownership and maintenance of the LOS [Parcel] be vested in the Town."

On 2 December 2005, the Town filed a complaint in the Circuit Court for Montgomery County asserting its power of eminent domain to acquire the LOS Parcel. Oxbridge Development at Washington Grove, L.C. was named as the sole defendant in the action as the fee simple owner of the LOS

---

5. Judicial review in a circuit court may be sought of "[a] final action by the Commission on any application for the subdivision of land within 30 days after the action is taken by the Commission . . . by any person aggrieved by the action, or by any . . . municipality . . . which has appeared at the hearing in person. . . ." Md.Code, Art. 28 § 7–116. *See generally* Md.Code, Art. 28 § 7–115(a)(1) ("Except as provided in paragraph (3) of this subsection, no plat of any subdivision of land within the regional district shall be admitted to the land records of either Montgomery or Prince George's County, or received or recorded by the clerks of the courts of these counties, until the plat has been submitted to and approved by the Commission and the approval endorsed in writing on the plat by its chairman and secretary. The filing or recordation of a plat of a subdivision without the approval of the Commission is void.").

Parcel.[6] Toll[7] filed an answer to the complaint on 11 January 2006. On 9 February 2006, Toll filed in the condemnation case a "Third Party Complaint for Declaratory Judgment" naming the MNCPPC as a third-party defendant. As part of the relief sought by Toll in the third-party complaint, the Circuit Court was asked to "declare and determine, to the extent the condemnation requested by Washington Grove is granted, that such condemnation fulfills the condition in the Preliminary Plan requiring the dedication of the [LOS Parcel] to [the MNCPPC]." Toll's interest was to ensure that the MNCPPC would be bound in its capacity as the approver of the subdivision plan if the Town was successful in condemning the LOS Parcel; in other words, Toll sought to avoid a situation in which the Town acquired the parcel thereby, making it impossible for Toll to comply with the 11 July 2005 subdivision approval, in particular Condition 15, and preventing Toll from moving forward with the development based on Preliminary Plan No. 1–02022.

On 30 March 2006, the MNCPPC filed an answer to Toll's third-party complaint. Thereafter, it participated broadly and actively in the proceedings in the Circuit Court, filing a designation of experts; an answer to the Town's 23 August 2006 amended complaint on 15 September 2006;[8] a motion to realign parties,[9] stay proceedings and stay amended schedul-

6. The record reveals that Oxbridge Development at Washington Grove, L.C., with the MNCPPC's consent, changed its name to "Toll MD II, LLC". An Order was entered by the Circuit Court on 3 July 2007 acknowledging this change and directing that the name of the defendant and the caption of the case be changed accordingly.

7. For simplicity, we shall refer to the record owner of the LOS Parcel henceforth as "Toll".

8. On 23 August 2006, the Town filed an amended complaint which differed from the original complaint only in that the complaint now included new exhibits and a more accurate metes and bounds legal description and sketch of the LOS Parcel produced by Toll during discovery.

9. On 15 November 2006, the MNCPPC filed its Motion to Realign Parties, requesting under Md. Rule 2–311 that the Circuit Court enter

ing; a motion to separate a legal question for decision by court; and, motions and supplemental memoranda in support of summary judgment (discussed *infra*).

Concurrently, while the litigation was in full flight, Toll continued to work toward approval of a final plat of subdivision for the initial phase of the development. On 19 April 2007, Toll sought to comply effectively with Condition 15 in the preliminary plan approval by "conveying" the LOS Parcel to the MNCPPC in a "Deed of Dedication." The Deed provides, in part, that the LOS Parcel "shall be used and maintained, in perpetuity, as a Legacy Open Space Natural Area ('LOS Area') in accordance with applicable criteria of Montgomery County, Maryland and for no other purpose." The MNCPPC claims that one of the incidental reasons it accepted delivery of Toll's Deed of Dedication was "to resolve the unfair consequence of placing Toll in an uncertain, no-win situation caused by the legal contest between the Town and Commission over condemnation of the LOS."

The Deed, however, contained a conditional "unwind" provision. That provision provides,

4. Unwind of Dedication

(a) Termination of Dedication. The Commission acknowledges that Toll is dedicating the LOS Parcel for the purpose of resolving the Taking Action, including the Third Party Claim, and in reliance upon its expectation that the final site plan and final plat of subdivision for Phase I will be finally approved in substantial accordance with the Preliminary Plan without undue delay. The Commission further acknowledges that there will be no justification or consideration for such dedication if these approvals are not obtained by Toll. Therefore, if the Preliminary Plan expires or otherwise terminates for any reason and, at the time of such

---

an order realigning the parties to establish the MNCPPC as a defendant on the ground that the MNCPPC acquired a real property interest by virtue of Condition 15 of the Planning Board's 11 July 2005 approval of the preliminary plan of subdivision. The motion was denied by the Circuit Court on 28 February 2007.

expiration or termination, a final site plan and final plat of Subdivision for all of Phase I (as Phase I is described in the Opinion) have not been finally approved in substantial accordance with the Preliminary Plan, the dedication of the [LOS Parcel] effected by the Dedication Deed shall automatically terminate and be of no further force or effect and the Commission shall immediately reconvey to Toll, for no consideration, all rights, title, estate, and interest of the Commission and the public in and to the [LOS Parcel]. Title to the [LOS Parcel] as of the time of reconveyance shall be free and clear of all liens and encumbrances other than those (if any) which affected the [LOS Parcel] immediately prior to the dedication of such parcel by Toll. Furthermore, if the site plan for all of Phase I has not been finally approved in substantial accordance with the Preliminary Plan on or before September 30, 2007, Toll reserves the right to require the termination of the dedication and the reconveyance of the [LOS Parcel] in the same manner as if the Preliminary Plan had expired or otherwise terminated without final approval of the site plan and plat for Phase I. Toll shall exercise this right, if at all, by written notice given to the Commission after September 30, 2007 and before final approval of the Phase I site plan. If Toll gives such notice to the Commission, the termination of the dedication shall occur immediately and the reconveyance of the [LOS Parcel] shall occur within ten (10) days after the next meeting of the Commission which follows the Commission's receipt of such notice.

Thus, the dedication by Toll was conditioned on approval of the site plan for Phase I and final plat of subdivision not only in accordance with the Montgomery County site development ordinances and the general zoning code, but also in "substantial accordance with [Preliminary Plan No. 1–02022]."

Prior to Toll's delivery of the Deed of Dedication to the MNCPPC, the Town and the MNCPPC, on 29 and 31 January 2007, respectively, filed their first motions for summary judgment in the Town's condemnation action. Several subsequent motions and memoranda in support of summary judgment

were submitted by the three participants. On 24 April 2007, the Circuit Court held a hearing on the motions for summary judgment. The MNCPPC argued that, even prior to receiving the Deed of Dedication from Toll, it had a legal interest in the LOS Parcel as a result of the conditions imposed in the 11 July 2005 approval of the preliminary plan of subdivision. The MNCPPC also argued that the Town, as a municipality, lacked authority to condemn the LOS Parcel because the MNCPPC has preemptive statutory jurisdiction to acquire, by condemnation or otherwise, property within the boundaries of both the Regional and Metropolitan Districts. Due to this overriding regulatory authority, it was pressed, the Town was without legal authority to condemn the LOS Parcel without first obtaining the MNCPPC's approval. Further, the MNCPPC argued that the Town lacked statutory authority to condemn or otherwise extinguish the MNCPPC's interest in the LOS Parcel because of the MNCPPC's status as an agency of the State.

The Town rejoined that the Deed of Dedication did not grant the MNCPPC a legally cognizable ownership interest in the LOS Parcel because the Deed contains the "unwind" provision. The Town argued that the doctrine of *lis pendens* forecloses the MNCPPC's ability to take a legal interest in the LOS Parcel because the condemnation action was filed before the Deed of Dedication was delivered by Toll. Further, the Town relied on its claimed power to condemn property "needed for any public purpose" under § 2(b)(24) of Article 23A of the Maryland Code.

On 6 September 2007, the Circuit Court issued an Opinion and Order granting partial summary judgment to the Town, and denying summary judgment to Toll and the MNCPPC. The Circuit Court concluded, after reviewing Md.Code, Article 23A § 7A and Article 25 § 224(a), and expanding upon its interpretation of our holding in *Birge v. Town of Easton*, 274 Md. 635, 337 A.2d 435 (1975), that "statutory authority and case law support a municipal corporation's ability to condemn property beyond the municipal corporation's corporate limits." The Circuit Court held that nothing in Md.Code, Article 23A,

nor Article 28 would prohibit, conflict with, or impliedly proscribe the Town from condemning the LOS Parcel. Further, the Circuit Court found that the Town's condemnation of the LOS Parcel satisfies sufficiently the "public purpose" requirement of Article 23A § 2(b)(24).

The Opinion and Order, however, failed to address how the Circuit Court viewed the MNCPPC as a party with regard to all remaining aspects of the litigation, and whether it would be permitted to participate in asserting its interests in the LOS Parcel. In order to clarify this point, on 5 October 2007, the MNCPPC filed a Motion to Intervene as a Party–Defendant in the Town's condemnation action, a Motion to Stay, and a Motion for Clarification and Reconsideration. The Town opposed in writing the Motion to Intervene on 24 October 2007, arguing that the motion was untimely and that the doctrine of *lis pendens* barred the MNCPPC's participation in the condemnation proceedings.

By Order dated 4 December 2007, and entered 5 December 2007, the Circuit Court denied, without a hearing or elaboration of reasons, the Motion to Intervene, Motion to Stay, and Motion for Clarification and Reconsideration, and granted the Town's Motion to Dismiss Toll's Third–Party Complaint. On 2 January 2008, the MNCPPC filed a notice of appeal to the Court of Special Appeals and sought review of the denial of its motion to intervene. We issued a writ of certiorari, upon the Town's petition and the MNCPPC's cross-petition,[10] before the

---

10. On 2 June 2008, the MNCPPC filed with the Court of Special Appeals a Motion to Stay the Circuit Court Proceedings. The Town filed an opposition. On 26 June 2008, the Court of Special Appeals granted the MNCPPC's Motion to Stay, in order to determine whether the MNCPPC's motion to intervene was denied properly. Prior to the stay, the Town's condemnation action before the Circuit Court was scheduled for a four day jury trial commencing on 6 October 2008.

On 3 July 2008, the Town filed a Petition for Writ of Certiorari with this Court seeking review of the Circuit Court's denial of the MNCPPC's motion to intervene and vacation of the Court of Special Appeals's 26 June 2008 order staying the proceedings in the Circuit Court. On 10 July 2008, the MNCPPC filed its Answer to the Town's Petition for Writ of Certiorari, stating that it has no objection to this Court's grant of certiorari, but opposing the Town's request that we vacate the Court of

intermediate appellate court considered the case. *Park & Planning v. Wash. Grove*, 405 Md. 348, 952 A.2d 224 (Table) (2008).

The successful petitions for certiorari pose, for the purposes of this appeal, three main issues:

1. Whether the Circuit Court erred in denying the MNCPPC's motion to intervene under Md. Rule 2–214?

2. Whether the doctrine of *lis pendens* applies to the Town's condemnation action?

3. If the doctrine of *lis pendens* does apply to the Town's condemnation action, what substantive effect, if any, does that doctrine have on the MNCPPC's ability to intervene under Md. Rule 2–214?

## II. LEGAL BACKGROUND

Because there are three governmental entities with potentially overlapping authority as regards the LOS Parcel at the heart of this dispute, the MNCPPC, the Town, and Montgomery County, Maryland (through the County's Subdivision Regulations), we pause to outline briefly the legal bases upon which these governmental entities may have sway over the subject property.

### A. The MNCPPC

The MNCPPC is an agency of the State of Maryland. Md.Code, Art. 28 § 1–101. It has at least two important functions relevant to this case, and performs those functions throughout most of Montgomery and Prince George's Counties. Md.Code, Art. 28 § § 3–101 to –107, 7–102 to –104. These functions are its "planning" and "park" functions:

The Commission is a bi-county agency created by the General Assembly to develop both general and functional plans of proposed land development for the Washington Metropolitan District, which consists of most of Montgom-

---

Special Appeals's stay order. In granting certiorari, we did not vacate the stay.

ery and Prince George's Counties. *See* Maryland Code, Art. 28, § 7–108. That is the main "planning" function. In carrying out the general plan, the Commission is authorized to acquire property within the District for roads, parks, forests, and other recreation facilities, and to improve and control such property for those purposes. *See id.* § 5–101. That is the main "park" function.

*Boyle v. Md.-Nat'l Capital Park & Planning Comm'n,* 385 Md. 142, 146, 867 A.2d 1050, 1053 (2005).

The "planning" function is outlined, *inter alia,* in §§ 7–108 and 7–110, which state, in part:

[§ 7–108]

(a)(1) At the direction of the district council for Prince George's County or the district council for Montgomery County, as the case may be, hereinafter referred to in this section as the "appropriate district council", the Commission shall initiate and adopt a general plan for the development of that portion of the Maryland–Washington Regional District located in each county and, from time to time, shall initiate and adopt amendments thereto. [Commission's authority to adopt a General plan]

\* \* \*

(b)(1) The appropriate district council shall provide for its county, pursuant to the procedures set forth in this section, to the extent necessary and feasible:

(i) That the Commission shall initiate and adopt, and the district council shall approve and from time to time amend a map showing the entire area of that county within the regional district, divided into local planning areas. Prior to the approval or amendment of the map, the district council shall consult with the Commission with respect to the boundaries of the local planning areas located wholly or partially within that county and, in the event of disagreement as to boundaries, the decision of the district council shall prevail within the area of its jurisdiction;

(ii) That, in accordance with the work program and budget adopted by the county council of that county, the

Commission shall initiate and adopt, and from time to time may amend or revise, a local master plan for each planning area, any part thereof, or any combination of contiguous planning areas; ... [Commission's authority to adopt local master plans]

\* \* \*

(c)(1) The Commission may make and adopt and from time to time amend, and the district councils may approve and amend, functional master plans for the various elements of the general plan, including but not limited to master plans of highways, mass transit that includes light rail and busways, hospitals and health centers, parks and other open spaces, police stations, fire stations, and utilities ... [Commission's authority to adopt functional master plans]

\* \* \*

[§ 7–110]

The making of the general plan, including its parts, amendments, extensions, or additions, the protection of and the carrying out of the plan, and the exercise of all planning, platting, zoning, subdivision control, and all other powers granted in this title to the Commission or to the County Council of Montgomery County or the County Commissioners of Prince George's County shall be with the purposes of guiding and accomplishing a coordinated, comprehensive, adjusted, and systematic development of the regional district, the coordination and adjustment of this development with public and private development of other parts of the State of Maryland and the of the District of Columbia, and the protection and promotion of the health, safety, morals, comfort, and welfare of the inhabitants of the regional district.

Md.Code, Art. 28 §§ 7–108, –110. The MNCPPC's geographic jurisdiction to adopt and implement, in coordination with the counties' district councils,[11] the General Plan, as well as the

---

11. Section 8–101(a) provides the definition of "district councils":

local and functional master plans, is referred to as the Regional District, which consists of most of Montgomery and Prince George's Counties. *See* Md.Code, Art. 28 § § 7–102 to –104. One of the few geographic exceptions to the MNCPPC's Regional District "planning" reach is municipal corporations that existed as of 1 June 1957 in Montgomery County, which are specifically exempted from the MNCPPC's and the Montgomery County Planning Board's planning and zoning powers. Md.Code, Art. 28 § 7–105.[12]

The MNCPPC's "park" function is delegated to it, *inter alia*, in § 5–101, which provides, in part:

(a) For the purpose of carrying out its general plans for the physical development of the metropolitan district, or any

---

(a) The County Councils of Montgomery County and Prince George's County are each individually designated, for the purposes of this article, as the district council for that portion of the regional district lying within each county, respectively. Sitting together, they are jointly designated, for the special purposes delineated in this article, as the bi-county district council for the entire Maryland–Washington Regional District. The adoption of an ordinance or resolution by the bi-county district council shall be accomplished only by the affirmative votes of a majority of the total membership of each district council.

12. Section 7–105 provides, in part:

(a) This section is applicable within the area of any municipal corporation subject to Article XI–E of the Constitution of Maryland lying in whole or in part within the area added to the regional district by Chapter 596 of the Acts of the General Assembly of 1957.

(b) Except as provided by agreement under this section, neither the Commission nor the Montgomery County Planning Board nor the district council may exercise any planning or zoning power or jurisdiction within any municipal corporation that existed as of June 1, 1957, as provided under subsection (a) of this section. A municipality that incorporates after June 1, 1957 may not exercise planning, zoning, or subdivision power unless expressly provided for in this article.
\* \* \*

(i) The Commission or the Montgomery County Planning Board, whenever it deems proper, may submit recommendations to any municipal corporation with respect to any planning or zoning action under consideration by the municipal corporation, and the recommendation of the Commission or the board shall be incorporated as a part of the record of the action by the municipal corporation.
\* \* \*

part thereof, the Commission may acquire land or other property located within the district for parks, parkways, forests, streets, roads, boulevards, or other public ways, grounds, or spaces, by means of donations, purchases, or condemnation. The Commission may improve and develop land or other property so acquired by it for these purposes and has the control of the maintenance and operation thereof. No general regulation governing these public ways, grounds, or open spaces within either Montgomery or Prince George's County may go into effect unless and until it receives the affirmative vote of at least three members of the Commission from that County.

 \* \* \*

Md.Code, Art. 28 § 5–101. The MNCPPC's geographic scope for acquiring land for parks, forests, streets, and other functions of its "park" function is referred to as the Metropolitan District, which also consists of most of Montgomery and Prince George's Counties. *See* Md.Code, Art. 28 § § 3–101 to –107. Similar to the geographic coverage for "planning" within the Regional District, incorporated municipalities in Montgomery County are also exempted from the Metropolitan District for park purposes, and therefore the MNCPPC's "park" function, by virtue of § 3–103.[13]

### B. Municipal Corporations

Municipal corporations in Maryland derive their authority from Article XI–E of the Constitution of Maryland, and, as relevant to the present case, Articles 23A and 66B of the Maryland Code. As we have stated previously, the general purpose of Article XI–E of the Constitution of Maryland was

---

**13.** Md.Code, Art. 28 § 3–103(a) provides, in part:

 (a) All of the area of Montgomery County not included within the Maryland–Washington Metropolitan District as it is now or may hereafter by defined, with the exception of the area now or hereafter located within the boundaries of municipal corporations as defined in Article 23A, § 9 of the Code, is hereby added to the Maryland–Washington Metropolitan District and is designated the "Upper Montgomery County Metropolitan District."

"to permit municipalities to govern themselves in local matters." *Inlet Assocs. v. Assateague House Condo. Ass'n,* 313 Md. 413, 425, 545 A.2d 1296, 1302 (1988) (citing *Birge v. Town of Easton,* 274 Md. 635, 644, 337 A.2d 435, 440 (1975)). Article 23A, § 1 empowers municipal corporations to "pass and adopt all ordinances, resolutions or bylaws necessary or proper to exercise the powers granted herein or elsewhere." Md.Code, Art. 23A § 1 (1957, 2005 Repl.Vol.). Section 2 of Article 23A implements Article XI–E by an express grant of powers to municipalities. *Inlet Assocs.,* 313 Md. at 425, 545 A.2d at 1302 (citing *Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 393, 396 A.2d 1080, 1086 (1979)).

Section 2(a) of Article 23A grants municipal corporations general authority, in particular the authority to pass ordinances not contrary to the Constitution of Maryland or public general law, as they deem necessary to assure the government of the municipality, protect and preserve the municipality's rights, property, and privileges, and protect the health, comfort, and convenience of its citizens. Section 2(a), however, further provides:

> but nothing in this article shall be construed to authorize the legislative body of any incorporated municipality to pass any ordinance which is inconsistent or in conflict with any ordinance, rule or regulation passed, ordained or adopted by the Maryland–National Capital Park and Planning Commission and the Washington Suburban Sanitary Commission. . . .

Md.Code, Art. 23A § 2.

Article 23A, § 2(b) enumerates 37 general express powers delegated by the General Assembly to municipal corporations. It provides, in pertinent part:

> (b) In addition to, but not in substitution of, the powers which have been, or may hereafter be, granted to it, such legislative body also shall have the following express ordinance-making powers:
>
> \* \* \*

(20) To establish and maintain such parks, gardens, play-grounds, and recreational facilities as in the discretion of the legislative body are deemed to be for the health and welfare of the municipality and its inhabitants.

\* \* \*

(24) To acquire by conveyance, purchase or condemnation real or leasehold property needed for any public pur-pose; . . . .

\* \* \*

Section 7A of Article 23A further provides that "[a]n incor-porated municipality may exercise any power or authority conferred by the provisions of Article 25 of this Code, in the subtitle 'Public Recreation and Parks.' " Md.Code, Art. 23A § 7A. Section 224 of Article 25, Md.Code, provides for the means by which a municipal corporation (or county) may acquire and use land, water, or buildings for park purposes. Section 224(a) provides:

(a) The governing body of any county or municipal corpo-ration may dedicate, set apart and maintain for use as park and recreation areas and facilities any water, land, buildings or other improvements thereon owned or leased by the county or municipal corporation. In addition, the governing body may acquire or lease any water, land, buildings or other improvements thereon, within or beyond the corpo-rate limits of the county or municipal corporation, in the manner now or hereafter authorized or provided by law for the acquisition or leasing of property for public purposes, for use as park and recreation areas and facilities; provided however, that nothing contained herein shall be construed to grant to such county or municipal corporation the power of condemnation if such county or municipal corporation does not have such power by virtue of other provisions of law.

Md.Code, Art. 25 § 224(a) (1957, 2005 Repl.Vol.).

The Town of Washington Grove is a municipal corporation organized and existing pursuant to Article XI–E of the Consti-tution of Maryland. MD. CONST. art. XI–E, § 1. The Town was originally chartered by an Act of the General Assembly on

18 May 1937. 1937 Md. Laws Ch. 372. It exercises local "home rule" power, MD. CONST. art. XI–E, § 3, and, therefore, is excluded from the Regional District, Md.Code, Art. 28 § 7–105, and the Metropolitan District, Md.Code, Art. 28 § 3–103. Thus, within its municipal boundaries, the Town is not subject to the MNCPPC's "planning" or "park" functions.

Implementing its delegated municipal powers, the Town adopted the following two powers in its municipal charter:

67. Acquisition, Possession, and Disposal

The Town may acquire real, personal, or mixed property for any public purpose by purchase, gift, bequest, devise, lease, condemnation, or otherwise and may sell, lease, or otherwise dispose of any property belonging to the Town. . . .

68. Condemnation

· The Town has the power to condemn property of any kind, or interest therein or franchise connected therewith, in fee or as an easement, within and outside the corporate limits of the Town, for any public purpose or benefit. Any activity, project, or improvement authorized by the provisions of this Charter, Town ordinances, or state law applicable to the Town is deemed to be a public purpose or benefit. The manner of procedure in case of any condemnation proceeding must be that established by State law.

WASH. GROVE, MD., CHARTER arts. 67 & 68 (1937).

## C. Montgomery County, Maryland

In Montgomery County, the District Council adopted subdivision regulations by an ordinance which is codified in the Montgomery County Code, Chapter 50, entitled "Subdivision of Land." Montgomery County Code ("County Code"), Ch. 50 (2004). Section 50–3 provides that the Chapter "shall apply to all land within the county which lies within the Maryland–Washington Regional District, as now defined by Article 28 of the Annotated Code of Maryland." County Code, § 50–3. Under Chapter 50 of the County Code, the subdivision of land, essentially, is a two step procedure.

The first step is the subdivision [14] plan [15] application process under which the proposed subdivision of land may be approved or approved subject to certain conditions. An applicant who desires to subdivide land must submit to the Montgomery County Planning Board an application, a proposed preliminary subdivision plan which consists of a tracing drawing, and a filing fee.[16] County Code, § 50–34. Pursuant to § 50–35(f), the Planning Board must either approve, approve with conditions, or disapprove the preliminary plan. An approved preliminary plan has a "Validity Period" during which the approved plan must be implemented or its validity will expire. County Code, § 50–35(h); *see* n.3, *supra.* At any time before recordation of a final plat of subdivision, an applicant (in its discretion) may abandon the subdivision application (if not acted upon yet by the Planning Board) or an approved preliminary plan (by simply allowing its validity to expire or by submitting a superseding plan application). There is no provision in Chapter 50 that precludes an applicant from filing an entirely new subdivision plan for the same land at any time, and there is no provision authorizing the Planning Board or any other government agency to compel an unwilling applicant to complete the final plat approval and recordation process in accordance with an approved subdivi-

---

**14.** "Subdivision" is defined in County Code, § 50–1 as:

The division or assemblage of a lot, tract or parcel of land into one (1) or more lots, plots, sites, tracts, parcels or other divisions for the purpose, whether immediate or future, or sale or building development and, when appropriate to the context, relating to the process of subdividing or to the land area subdivided; provided, that the definition of subdivision shall not include a bona fide subdivision or partition of exclusively agricultural land not for development purposes. A resubdivision is a subdivision.

**15.** "Plan" is defined in County Code, § 50–1 as "[a] plan of subdivision proposed or submitted by a subdivider or developer for approval by the [Planning B]oard."

**16.** *See* County Code, § 50–1 (defining "Preliminary Plan" as "[a] plan for a proposed subdivision or resubdivision to be prepared and submitted for approval, in accordance with specifications and procedures provided herein, prior to preparation of a subdivision plat").

sion plan.[17]

After a preliminary plan of subdivision is approved, the concluding step in perfecting that approval is to obtain Planning Board approval of a final plat [18] for the subdivision. County Code, §§ 50–7 to –8. It is at the final plat approval stage that the "area" to be "dedicated to public use," pursuant to relevant conditions attached to the approved preliminary plan, typically are shown on and dedicated by the "Subdivision Record Plat." County Code, § 50–36(c)(6). After the Planning Board approves a final plat, and the absence of judicial review of that action, or after judicial review the plat approval is upheld, *see* Md.Code, Art. 28 § 7–116, the approved final subdivision plat is transmitted to the clerk of the Circuit Court to be recorded among the land records of Montgomery County. County Code, § 50–37(f)(5).[19] After this stage, for the applicant/developer wishing to proceed with developing the subject property, the permit processing phase of development occurs, such as obtaining building and construction permits. *See* County Code, § 50–20(a).

### III. DISCUSSION

#### A.

Md. Rule 2–214 governs intervention in litigation in the Maryland courts. This Rule provides, in pertinent part:

---

17. A subdivision plan may be amended with the approval of the Planning Board. *See* County Code, § 50–35(f) ("Following approval of a preliminary plan by the Board, no agency shall require a substantial change in the plan, other than those which may be required by conditions of approval specified by the Board, except upon amendment of the plan, approved by the Board, or under procedures for revocation of a plan as provided by subsection (i) of this section, title, 'revocation of approval.' ").

18. "Plat" is defined in County Code, § 50–1 as "[t]he record plat required for the land records of Montgomery County, in accordance with the specifications in this Chapter."

19. Even after approval and recordation of a subdivision plat, the applicant, any successor in interest, or the County "may petition to abandon any land dedicated under this Section." County Code, § 50–15(c).

(a) Of Right. Upon timely motion, a person shall be permitted to intervene in an action: (1) when the person has an unconditional right to intervene as a matter of law; or (2) when the person claims an interest relating to the property or transaction that is the subject of the action, and the person is so situated that the disposition of the action may as a practical matter impair or impede the ability to protect that interest unless it is adequately represented by existing parties.

(b) Permissive. (1) Generally. Upon timely motion a person may be permitted to intervene in an action when the person's claim or defense has a question of law or fact in common with the action.

(2) Governmental interest. Upon timely motion the federal government, the State, a political subdivision of the State, or any officer or agency of any of them may be permitted to intervene in an action when the validity of a constitutional provision, charter provision, statute, ordinance, regulation, executive order, requirement, or agreement affecting the moving party is drawn in question in the action, or when a party to an action relies for ground of claim or defense on such constitutional provision, charter provision, statute, ordinance, regulation, executive order, requirement, or agreement.

(3) Considerations. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

\* \* \*

Md. Rule 2–214. We have held "[t]hat the denial of a claim to intervene, both as a matter of right [and permissively] under [the predecessor to Md. Rule 2–214] . . ., becomes immediately appealable is no longer open to question." *Md. Radiological Soc'y, Inc. v. Health Servs. Cost Rev. Comm'n,* 285 Md. 383, 388 n. 4, 402 A.2d 907, 910 n. 4 (1979). "That the State has a right to appeal from a denial of a motion to intervene is no longer open to doubt." *Md.-Nat'l Capital Park & Planning*

*Comm'n v. Wash. Nat'l Arena,* 30 Md.App. 712, 714, 354 A.2d 459, 460 (1976) (citing *Citizens Coordinating Comm.,* 276 Md. at 714, 351 A.2d at 139), *rev'd on other grounds,* 282 Md. 588, 386 A.2d 1216 (1978).

As we articulated in *Montgomery County v. Ian Corp.,* 282 Md. 459, 385 A.2d 80 (1978), Md. Rule 208 governing intervention in the circuit courts (the predecessor to current Md. Rule 2–214) was derived from FED.R.CIV.P. 24 as it formerly appeared. *Ian Corp.,* 282 Md. at 463, 385 A.2d at 82. In *Ian Corp.,* we adopted the test explained by the Supreme Court in *NAACP v. New York,* 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973), as the proper one for appellate review of a denial of an asserted right to intervene, as well as to determine whether a motion to intervene has been filed timely. *Ian Corp.,* 282 Md. at 465, 385 A.2d at 83.

A close reading of *NAACP v. New York,* however, reveals that the Supreme Court there provided only a standard of review for denials of motions to intervene based on untimeliness—whether an abuse of discretion occurred. The Court acknowledged explicitly that an abuse of discretion standard was not being applied to any of the other standards for determining intervention, whether asserted to be of right or permissive. *See NAACP v. New York,* 413 U.S. at 369, 93 S.Ct. 2591 ("We therefore conclude that the motion to intervene was untimely and that the District Court did not abuse its discretion in denying the appellants' motion. . . . This makes it unnecessary for us to consider whether other conditions for intervention under [FED.R.CIV.P. 24] were satisfied."). Thus, although we seemingly announced in *Ian Corp.* our adoption of an abuse of discretion standard for appellate review of a denial of an asserted right to intervene, a close reading of *NAACP v. New York* informs us that the question of the proper standard of review for a ruling on a motion to intervene implicating any ground except timeliness remained an open question in Maryland.·

Subsequent federal authority decided under FED. R.CIV.P. 24 fills the gap. The majority of those authorities

determined that the denial of a motion to intervene premised on a matter of right on any of the other permissible grounds is reviewed non-deferentially for legal correctness. *Fox v. Tyson Foods, Inc.*, 519 F.3d 1298, 1301 (11th Cir.2008) (citing *Purcell v. BankAtlantic Fin. Corp.*, 85 F.3d 1508, 1512 (11th Cir.1996)); *Haspel & Davis Milling & Planting Co. v. Bd. of Levee Comm'rs*, 493 F.3d 570, 577 (5th Cir.2007) (citing *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir.1996)); *Arakaki v. Cayetano*, 324 F.3d 1078, 1082 (9th Cir.2003) (citing *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 817 (9th Cir.2001)); *South Dakota ex rel. Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 785 (8th Cir.2003) (citing *Turn Key Gaming, Inc. v. Oglala Sioux Tribe*, 164 F.3d 1080, 1081 (8th Cir.1999)); *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1249 (11th Cir.2002) (citing *Purcell*, 85 F.3d at 1512); *Sierra Club v. U.S. Envtl. Prot. Agency*, 995 F.2d 1478, 1481 (9th Cir.1993) (citing *Scotts Valley Band of Pomo Indians v. United States*, 921 F.2d 924, 926 (9th Cir.1990)). If the motion to intervene was denied by a trial judge due to a finding of untimeliness, however, the authorities remain consistent in the view that the proper standard of review is abuse of discretion, provided the trial court articulates reasons why the motion was untimely. *Effjohn Int'l Cruise Holdings, Inc. v. A & L Sales, Inc.*, 346 F.3d 552, 558–59 (5th Cir.2003) (citing *John Doe No. 1 v. Glickman*, 256 F.3d 371, 377 (5th Cir.2001)). A denial of permissive intervention, however, has been found to be subject to review only for abuse of discretion. *Fox*, 519 F.3d at 1301 (citing *Worlds v. Dep't of Health & Rehabilitative Servs.*, 929 F.2d 591, 595 (11th Cir.1991) (per curiam)). These standards are consistent with the development of Maryland law concerning intervention,[20] and we adopt them.[21]

---

**20.** Our review of Maryland case law addressing questions of intervention reveals that we have not articulated explicitly the appropriate standards of appellate review applicable to rulings on motions to intervene. The development of that case law and, importantly, the implementation of now Md. Rule 2-214 (formerly Md. Rule 208), however, support our adoption of the standards articulated in the federal authorities.

**66**

In one of the earlier occasions where the issue of intervention was addressed substantively in Maryland, this Court affirmed the trial court's denial of an intervention request, under the abuse of discretion standard, on lack of timeliness grounds. *Alexander v. Md. Trust Co.*, 106 Md. 170, 66 A. 836 (1907). As was stated there,

> It was in the discretion of the court below to refuse to permit Archibald A. Alexander to intervene and take testimony when he applied for leave to do so, and we will dismiss his appeal. If we had entertained it, we would have affirmed the action of the court, as a party should not be permitted to remain out of the case of which he has knowledge until after it is decided against him, and then become a party and delay the final settlement of it, unless he can show better reasons for so doing than this petition furnishes.

*Alexander*, 106 Md. at 189, 66 A. at 844. In 1933, we affirmed a denial of intervention, apparently on the merits, under an abuse of discretion standard, in *Stirn v. Radio–Keith–Orpheum Corp.*, 163 Md. 398, 163 A. 696 (1933). There, the Court stated

> In declining to admit the appellant as a party at the time and for the purpose shown by the record, the court below acted in the exercise of a competent and sound discretion. Its order denying the appellant's request to be made a party did not adjudicate any of his rights, but expressly left him free to bring an independent suit. Because of its discretionary nature and its lack of finality, the order was, in a double aspect, not appealable.

*Stirn*, 163 Md. at 400, 163 A. at 697.

A year later, this Court demurred from *Stirn's* conclusion that rulings on intervention are not appealable, finding "[b]ut while the appeal will not be dismissed on the ground that the order was passed in the exercise of an irreviewable discretion, it must be dismissed on the second ground stated in *Stirn....* It lacked finality." *Conroy v. S. Md. Agric. Ass'n*, 165 Md. 494, 509, 169 A. 802, 808 (1934). Importantly, in *Conroy* the Court signaled that the practice of intervention was not as discretionary in the trial courts as it used to be, finding

> While the authorities are not in accord as to the right of one interested in the subject-matter of an equity proceeding to intervene therein, the rule in this state, and one generally recognized elsewhere, is that the right to so intervene is not, unless the proceeding is *in rem* and the ultimate decree will finally determine some interest, claim, or property right of the petitioner, absolute, but rests in the sound discretion of the court.... And in the note in the report last cited the annotator points out that intervention has no historical support, but rests upon statute, that it was borrowed from the civil law, and, while employed to some extent in the English ecclesiastical courts, it was unknown to the common law as well as to equity practice.... But in modern practice, irrespective of statutory authority, it is undoubtedly the law that courts may in their sound discretion permit intervention in some cases and in others must permit it.

*Conroy*, 165 Md. at 502–03, 169 A. at 805 (citations omitted). That rulings on intervention were appealable, albeit under an abuse of discretion standard, was confirmed by three subsequent rulings of this Court over the ensuing 25 years. *See Stagge v. City Serv. Comm'n*, 217 Md. 466, 475, 143 A.2d 502, 506–07 (1958) ("We find no abuse of

discretion in the action of the chancellor in rescinding the order that had admitted the appellant Heinekamp as an intervenor. The matter of intervention primarily is one for the sound discretion of the trial court, determined in the light of the would-be intervenor's interest in the subject matter of the suit and the issues raised by that proceeding. . . . We think there was no abuse of the court's discretion in finally denying him the right to intervene.") (citations omitted); *Douglas v. Friedel*, 216 Md. 11, 14–15, 139 A.2d 259, 261 (1958) ("Where a proceeding is *in rem* and the ultimate decree will finally determine some interest, claim, or property right of the petitioner, the petitioner has a right to intervene . . .; but, generally, the privilege of intervening is within the discretion of the trial court, measured in light of the intervenor's interest in the subject matter of the suit and the issues raised by the proceedings. However, the exercise of this discretion is reviewable upon appeal if it amounts to an abuse thereof by the trial court.") (citation omitted); *Nyburg v. Solmson*, 205 Md. 150, 156, 106 A.2d 483, 485 (1954) ("Generally, the right to intervene is within the discretion of the trial court, measured in the light of the intervenor's interest in the subject matter and the issues raised by the proceedings. The exercise of that discretion as to the right of intervention, generally is not subject to appeal; it may be if the action of the court amounts to an abuse of discretion.").

The abuse of discretion standard of review for all denial rulings on intervention remained until the adoption of Md. Rule 208, the predecessor to the current Md. Rule 2–214. With the adoption of Md. Rule 208, a rule of procedure derived from Fᴇᴅ R.Cɪᴠ P. 24, which provided that a person "shall be permitted to intervene in an action" by right if certain standards are satisfied, the Court recognized that abuse of discretion review for rulings on motions to intervene as of right, although in line with Maryland precedent, likely was inconsistent with the intent of Md. Rule 208. The shift in thinking was recognized in *Citizens Coordinating Committee*, where this Court stated

Although we have never flatly passed upon the appealability of an order denying intervention asserted as a matter of right, the Court of Special Appeals has recently done so in *Nat'l 4–H Club v. Thorpe*, 22 Md.App. 1, 9, 321 A.2d 321 (1974). There, it held that the denial of intervention claimed as of right under Rule 208 a is an appealable order. In so holding, it followed a line of cases decided under Rule 24 of the Federal Rules of Civil Procedure, the relevant part of which, in its pre–1966 form, was identical to Rule 208 a. Where intervention is permissive, however, the order denying intervention is appealable only if the court has abused its discretion. 3B Moore's Federal Practice ¶ 24.15. Prior to the adoption of our rules of procedure, when there was no provision for intervention as a matter of right, we had applied the latter rule in Maryland. *See, e.g., Weinberg v. Fanning*, 208 Md. 567, 571, 119 A.2d 383 (1956); *Stirn v. Radio-Keith Etc. Corp.*, 163 Md. 398, 400–01, 163 A. 696 (1933).

The federal appellate courts traditionally have followed a general rule of reversing an erroneous denial by the trial court of intervention of right or abuse of discretion in denying permissive intervention, but dismissing the appeal where the trial court had properly denied the application for intervention. *See generally,* Moore's Federal Practice,

*supra;* C. Wright & A. Miller, Federal Practice and Procedure, Civil, § 1923 (1972). Later cases, however, have recognized the impracticability of resolving the threshold issue of appealability without first deciding the merits. *See, e.g., Levin v. Ruby Trading Corporation,* 333 F.2d 592, 594 (2d Cir.1964).

The recent trend, therefore, has been in the direction of recognizing the necessity of examining the propriety of the denial by the trial court. Under this view, the appellate court affirms where the denial of the intervention is deemed to be correct and reverses where it concludes that intervention of right was erroneously denied or the trial court abused its discretion in refusing to allow permissive intervention, in effect treating the denial as an appealable order. Moore's Federal Practice; Wright & Miller, Federal Practice and Procedure, both *supra.* In *Nat'l 4–H Club v. Thorpe, supra,* 22 Md.App. at 9, 321 A.2d 321, the Court of Special Appeals made explicit reference to this shift in the federal decisions and affirmed a denial of intervention after finding the appellant there to be without any right to intervene under Rule 208 a. We think that the procedure applied there and in the more recent federal cases is preferable and we shall follow it here. We simply hold that the denial of intervention claimed as of right under Rule 208 a is appealable.

*Citizens Coordinating Comm. on Friendship Heights, Inc. v. TKU Assocs.,* 276 Md. 705, 709–10, 351 A.2d 133, 136–37 (1976). Then, in 1978, this Court decided *Montgomery County v. Ian Corp.,* 282 Md. 459, 385 A.2d 80 (1978), where we purported to adopt the "test laid down by the Supreme Court in *NAACP [v. New York,* 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973)] as the proper one to determine whether a motion to intervene has been timely filed ... [as well as] the standard there enunciated for appellate review of a denial of the right to intervene." *Ian Corp.,* 282 Md. at 465, 385 A.2d at 83. A review of the *NAACP* case, however, indicates that the Supreme Court only addressed the standard of review for a denial based on timeliness. *See NAACP v. New York,* 413 U.S. at 369, 93 S.Ct. 2591 ("We therefore conclude that the motion to intervene was untimely and that the District Court did not abuse its discretion in denying the appellants' motion.... This makes it unnecessary for us to consider whether other conditions for intervention under [FED.R.Civ P. 24] were satisfied."). The 1978 *Ian Corp.* Court makes no mention of the *Citizens Coordinating Committee* decision, *see Ian Corp.,* 282 Md. at 463, 385 A.2d at 82 ("Maryland Rule 208 was derived from Fed.R.Civ.P. 24 as it formerly appeared.... Since there are no relevant Maryland cases on the subject, we examine what has been said relative to the federal rule.") (footnote omitted), but, nevertheless, quotes federal authority in favor of the view that rulings on intervention as of right should be reviewed under a non-deferential standard. *See Ian Corp.,* 282 Md. at 463, 385 A.2d at 82 ("In theory permissive intervention is discretionary with the court, but there is no discretion where intervention is as of right." (quoting 2 W. BARRON & A. HOLTZOFF, FEDERAL PRACTICE AND PROCEDURE s. 602 (C. Wright rev.1961))).

From the development of our case law, in particular the case law after the adoption of Md. Rule 208, and in light of our view that decisions of the federal courts interpreting FED.R.Civ.P. 24 are of considerable precedential value in matters concerning Maryland's inter-

## B.

Md. Rule 2–214 contains four requirements a person must satisfy in order to intervene as of right: 1) the application was timely; 2) the person claims an interest relating to the property or transaction that is the subject of the action; 3) the person is so situated that the disposition of the action, as a practical matter, may impair or impede that person's ability to protect that interest; and 4) the person's interest is not

vention rule, *see* n.21, *infra*, we adopt the federal standards articulated in the text, *supra*, as the standards for review under Md. Rule 2–214. The post-*Citizens Coordinating Committee* decisions of our Maryland appellate courts are mostly consistent with these standards. *See Duckworth v. Deane*, 393 Md. 524, 903 A.2d 883 (2006) (reviewing denial of motions to intervene as of right under apparent non-deferential standard); *Chapman v. Kamara*, 356 Md. 426, 445–46, 739 A.2d 387, 397 (1999); *Coal. for Open Doors v. Annapolis Lodge No. 622, Benevolent & Protective Order of Elks*, 333 Md. 359, 367–68, 371, 635 A.2d 412, 416–17 (1994) (reviewing timeliness issue under abuse of discretion standard); *Md. Radiological Soc'y, Inc. v. Health Servs. Cost Review Comm'n*, 285 Md. 383, 392, 402 A.2d 907, 912–13 (1979) (reviewing right to intervention ruling under non-deferential standard, but permissive intervention under abuse of discretion standard); *Prof'l Staff Nurses Ass'n v. Dimensions Health Corp.*, 110 Md.App. 270, 677 A.2d 87 (1996) (reviewing permissive motion to intervene ruling under abuse of discretion standard); *Sipes v. Bd. of Municipal & Zoning Appeals*, 99 Md.App. 78, 95, 635 A.2d 86, 95 (1994) (reviewing timeliness issue under abuse of discretion standard); *Stewart v. Tuli*, 82 Md.App. 726, 733, 573 A.2d 109, 112 (1990) (reviewing intervention as of right ruling under non-deferential standard); *Hartford Ins. Co. v. Birdsong*, 69 Md.App. 615, 626, 630, 519 A.2d 219, 224, 226 (1987) (reviewing timeliness under abuse of discretion standard, but sufficiency of interest under non-deferential standard); *Barnes v. Comm'r of Labor & Indus.*, 45 Md.App. 396, 401–02, 413 A.2d 259, 262–63 (1980) (reviewing permissive intervention ruling under abuse of discretion standard). *Contra Pharmaceia Eni Diagnostics, Inc. v. Wash. Suburban Sanitary Comm'n*, 85 Md.App. 555, 569, 584 A.2d 714, 721 (1991) ("Considering the merits of the motion to intervene, as if it had been timely filed, we would find no abuse of discretion in denying it."). To the extent that appellate opinions of this State are inconsistent with these standards, they are no longer the law of Maryland to the extent of such inconsistency. *C.f. Pharmaceia Eni Diagnostics*, 85 Md.App. at 569, 584 A.2d at 721.

21. *See Md. Radiological Soc'y*, 285 Md. at 389 n. 5, 402 A.2d at 911 n. 5, ("[T]he similarity of Maryland Rule [now 2–214] and Federal Rule 24 makes the decisions of the federal courts interpreting their rule of considerable precedential value in construing our rule.").

adequately represented by existing parties to the suit. Md. Rule 2–214(a); *see, e.g., Chapman v. Kamara,* 356 Md. 426, 443, 739 A.2d 387, 396 (1999). We shall consider the denial of the MNCPPC's motion to intervene as of right, in turn, under each of these requirements.

1.

As was stated in *Pharmaceia Eni Diagnostics,*

[i]n determining whether a motion to intervene has been timely filed, a court must consider the purpose for which intervention is sought, the probability of prejudice to the parties already in the case, the extent to which the proceedings have progressed when the movant applies to intervene, and the reason or reasons for the delay in seeking intervention.

*Pharmaceia Eni Diagnostics, Inc. v. Wash. Suburban Sanitary Comm'n,* 85 Md.App. 555, 568, 584 A.2d 714, 721 (1991) (citing *Md. Radiological Soc'y,* 285 Md. at 389, 402 A.2d at 911). Timeliness depends upon the individual circumstances in each case, and, as we have indicated here, consideration of those circumstances rests initially with the sound discretion of the trial court, which, unless abused, will not be disturbed on appellate review. *Coalition for Open Doors v. Annapolis Lodge No. 622, Benevolent & Protective Order of Elks,* 333 Md. 359, 367–68, 635 A.2d 412, 416 (1994) (quoting *Md. Radiological Soc'y,* 285 Md. at 388, 402 A.2d at 910). In the case *sub judice,* such circumstances include that the MNCPPC's motion was filed after the partial summary judgment in favor of the Town was entered by the Circuit Court. That judgment resolved as a matter of law the Town's legal authority to condemn the LOS Parcel, enabling the Town to move forward with the trial (valuation) phase of the condemnation action, which was to proceed against Toll as the sole defendant in the case.

In *Coalition for Open Doors,* we observed that the filing of a motion to intervene, even after a judgment (partial or final) has been entered by a circuit court, under the proper circum-

stances, may satisfy nonetheless the timeliness requirement. In that case we stated,

> Neither the federal cases (including the cases cited by the Annapolis Lodge) nor the decisions of this Court set forth any special standard or requirement, such as that urged by the Annapolis Lodge, for intervention after the trial court's decision. Rather, under circumstances like those in the present case, where the losing party declines to appeal, courts generally permit an applicant to intervene for the purpose of appeal where the applicant has standing and where the applicant acts promptly after the trial court's decision. *See, e.g., United Airlines, Inc. v. McDonald*, 432 U.S. 385, 395–96, 97 S.Ct. 2464, 2470–2471, 53 L.Ed.2d 423, 432–33 (1977) ("The critical inquiry in every such case is whether in view of all the circumstances the intervenor acted promptly after the entry of final judgment.... Here, the respondent filed her motion within the time period in which the named plaintiffs could have taken an appeal"); *Yniguez v. State of Ariz.*, 939 F.2d 727, 731 (9th Cir.1991) (" 'post-judgment intervention for purposes of appeal may be appropriate if the intervenors ... meet traditional standing criteria,' " quoting *Legal Aid Soc'y of Alameda County v. Brennan*, 608 F.2d 1319, 1328 (9th Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980)); *F.W. Woolworth Co. v. Miscellaneous Warehousemen's*, 629 F.2d 1204, 1213 (7th Cir.1980), *cert. denied*, 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981) ("an application for intervention is timely if it is brought shortly after the [existing party representing similar interests] indicates that she will not appeal")....

> \* \* \*

As previously discussed, where the losing party decides not to appeal, the cases have upheld post-judgment intervention for purposes of appeal when the applicant has the requisite standing and files the motion to intervene promptly after the losing party decides against an appeal.... The motion to intervene [in this case] was filed only four days after the City Council voted against an appeal. The intervenors obviously acted promptly. Under the circumstances

the circuit court was fully warranted in permitting intervention.

*Coalition for Open Doors,* 333 Md. at 368–71, 635 A.2d at 416–17.

■ Applying the factors outlined in *Pharmaceia Eni Diagnostics* to the case at hand, in light of our holdings in *Coalition for Open Doors,* we conclude that the Circuit Court's denial of the MNCPPC's motion to intervene, to the extent it was predicated on untimeliness, amounted to an abuse of discretion. The MNCPPC commenced its participation in the proceedings in the Circuit Court with the filing of its 30 March 2006 answer to Toll's third-party complaint. Thereafter, it participated broadly and actively in the proceedings, including filing numerous motions and arguing before the Circuit Court as if a party in opposition to the Town's condemnation initiative for all purposes. The MNCPPC's participation included: filing on 22 September 2006 an answer to the Town's amended complaint; filing on 15 November 2006 a motion to realign parties, stay proceedings, and stay amended scheduling (and participating in oral argument thereon on 28 February 2007); filing on 31 January 2007 a motion to separate a legal question for decision by the court [22] and first motion for summary judgment; filing on 20 April 2007 and 18 May 2007 memoranda in support of its first motion for summary judgment; filing on 18 May 2007 a motion in opposition to the Town's motion for partial summary judgment; participating in oral argument on the summary judgment motions on 24 April 2007; and filing on 5 October 2007 motions for intervention, stay, and clarification and reconsideration. The obvious intent of the MNCPPC throughout this substantial participation in the Circuit Court was to oppose directly the Town's attempt to condemn the LOS Parcel on the basis that it was an unlawful conflict with the MNCPPC's exercise of its planning and park functions in the Regional and Metropolitan Districts. Until the motion to intervene, filed admittedly rather late in the

---

22. This motion requested the Circuit Court to separate the legal issue of whether the Town has the legal authority to condemn the LOS Parcel. The motion was granted by the Circuit Court on 24 April 2007.

going, the Town and the Circuit Court seemed unconcerned that the MNCPPC had been participating as if it were a full party in the condemnation case. No hue or cry was raised until the opposition to the motion to intervene was advanced late in the going. Thus, until the sole remaining issue left to be tried in the action was how much the Town will pay for the LOS Parcel, everyone treated the MNCPPC as a party.

The MNCPPC's opposition to the Town's condemnation attempt is based on the Planning Board's approval requiring Toll to dedicate the LOS Parcel to the MNCPPC in order for Toll to be able to carry out its development plan pursuant to Preliminary Plan of Subdivision No. 1–02022. The approval was issued on 11 July 2005 and was not challenged by any party to the administrative proceedings, including the Town, and, importantly, the approval and condition as to the LOS Parcel was the product of some four years of negotiations between the Town, the MNCPPC, and the property owner over the fate of the LOS Parcel relative to the development plans for the entire tract. This action predated the 2 December 2005 condemnation action initiated by the Town. In the midst of the condemnation proceedings in the Circuit Court, on 19 April 2007, Toll purportedly performed under Condition 15 of the subdivision approval, albeit subject to the "unwind" provision, by "conveying" to the MNCPPC the LOS Parcel in a "Deed of Dedication."

Under the factors set forth in *Pharmaceia Eni Diagnostics,* in light of the procedural posture of this case, it is clear that the MNCPPC participated actively in the proceedings in the Circuit Court in an attempt to protect the perceived property interest that Toll was expected to convey to it; the MNCPPC's perceived interest became all the more relevant after Toll's attempt to convey the LOS Parcel to the MNCPPC in the 19 April 2007 "Deed of Dedication". At the very least, upon the issuance of the approval by the Planning Board, the MNCPPC had some reasonable expectation that Toll would perform under the conditions of that approval, including the required dedication, even though, as noted earlier here, at any point Toll could have abandoned the approved

plan and allowed the conditions to expire. That the disposition of the LOS Parcel as provided for in the condition of the approved plan was the product of four years of negotiation, including participation by the Town, however, suggests that Toll intended to follow through with the approved plan and dedicate the LOS Parcel to the MNCPPC as part of developing its property pursuant to the approved plan.

Although the MNCPPC was impleaded by Toll and participated substantially in the proceedings in the Circuit Court, the trial judge held, in denying the MNCPPC's summary judgment motion, that due to the "unwind" provision in the Deed of Dedication, the dedication from Toll was contingent at best, and, therefore, the MNCPPC "is not the owner of the [LOS Parcel] and as such has no role in the condemnation of the property by the Town." The trial court's holding notwithstanding, the MNCPPC had a clear and discernable interest, under at least the Deed, to intervene in the condemnation action to protect its interest, however it may be characterized, in the LOS Parcel. The MNCPPC filed its motion to intervene on 5 October 2007, soon after the Circuit Court's summary judgment rulings and, upon the denial of the motion on 5 December 2007, the MNCPPC filed timely a notice of appeal to the Court of Special Appeals. *See* Md. Rule 8–202(a) ("Except as otherwise provided in this Rule or by law, the notice of appeal shall be filed within 30 days after entry of the judgment or order from which the appeal is taken."). The MNCPPC and the Town litigated at length on the merits on the condemnation and dedication issues before the Circuit Court, thereby removing any reasonable apprehension of prejudice to any existing parties or undue delay in the progression of the proceedings. Therefore, we conclude that the denial of the MNCPPC's motion to intervene, to the extent based on untimeliness, was an abuse of discretion.

2.

a.

As stated in *Citizens Coordinating Committee on Friendship Heights, Inc. v. TKU Associates*, 276 Md. 705, 351

A.2d 133 (1976), "[t]he requirement which we have imposed on the applicant for intervention ... is that he have an interest for the protection of which intervention is essential and which is not otherwise protected." *Citizens Coordinating Comm.*, 276 Md. at 712, 351 A.2d at 138 (citing *Shenk v. Md. Dist. Sav. & Loan Co.*, 235 Md. 326, 327, 201 A.2d 498, 499 (1964)). Put another way, "whether the applicant for intervention has an interest which it is essential to protect may be equated with the requirement ... that he 'is or may be bound by a judgment in the action.'" *Citizens Coordinating Comm.*, 276 Md. at 712, 351 A.2d at 138. It is not enough for a person seeking intervention to base its motion on concern that some future action in the proceedings may affect its interests adversely. Seeking intervention on such a basis is "merely speculative and affords no present basis upon which to become a party to the proceedings." *Shenk*, 235 Md. at 327, 201 A.2d at 499.

The Town argues that the MNCPPC cannot satisfy this requirement because the nature of its interest in the LOS Parcel received from Toll in the Deed of Dedication is insufficient to demonstrate that the MNCPPC "may be bound by a judgment in the [condemnation] action." The Town argues that, under Maryland law, a public dedication gives no more than an easement interest to the recipient. *See Md.-Nat'l Capital Park & Planning Comm'n v. McCaw*, 246 Md. 662, 675, 229 A.2d 584, 591 (1967) ("When a parcel of land is dedicated as a street or for other public use, the owner of the land retains his fee simple interest, subject to an easement for the public."); *Toney Schloss Props. Corp. v. Berenholtz*, 243 Md. 195, 205–06, 220 A.2d 910, 915 (1966) (" '[T]he dedicator retains the fee and the full right of enjoyment so far as this does not interfere with the dedicated use ....' " (quoting *King v. N. Chesapeake Beach Land & Improvement Co.*, 143 Md. 693, 698, 123 A. 455, 456 (1923))); *N. Beach v. N. Chesapeake Beach Land & Improvement Co.*, 172 Md. 101, 120, 191 A. 71, 80 (1937) ("The title to the bed of the highway is in the dedicator, its successors and assigns, since the dedication does not affect the ownership of the land, but merely gives to the

public the right of its user for the purpose intended by its dedicator.") (citations omitted); *Windsor Resort Inc. v. Mayor of Ocean City,* 71 Md.App. 476, 483, 526 A.2d 102, 105 (1987) ("The interest that the public—or a governmental entity on behalf of the public—can acquire through dedication of a street or way (or a park or any other facility for public use) is an easement or right of user, not a fee."). Therefore, the Town posits, the MNCPPC acquired only an easement for public use as a result of the dedication from Toll, an insufficient interest to bind the MNCPPC under any decision by the Circuit Court in the condemnation action regarding the LOS Parcel, because Toll remains as "the owner of the land retain[ing] his fee simple interest." *McCaw,* 246 Md. at 675, 229 A.2d at 591.

The MNCPPC responds that the nature of the interest it acquired in the Deed of Dedication from Toll, even if only an easement for public use, supports the notion that a judgment of condemnation in the Town's favor regarding the LOS Parcel will bind the MNCPPC. Several of our cases support this position, including *De Lauder v. County Comm'rs,* 94 Md. 1, 50 A. 427 (1901), where the Court found:

Property has been defined as "the dominion, or indefinite right of user and disposition which one may lawfully exercise over particular things or subjects." 19 *Amer. & Eng. Ency. of Law,* 284. It extends to easements and other incorporeal hereditaments, which, though without tangible or physical existence, may become the subject of private ownership. *Tripp v. Overocker,* 7 Colo. 74 [*Trippe v. Overocker,* 7 Colo. 72, 1 P. 695]. Here the land over which the right of way was enjoyed was not the property of Mrs. DeLauder. The right to use this land, within certain prescribed limits, was the only property right she had in the land, and it is this right of user which is alleged to have been taken by the defendants. The plea does not deny the averments of the declaration, but is admittedly a plea in confession and avoidance. . . . The injury inflicted upon Mrs. DeLauder is not the rendering the use of her right of way inconvenient or expensive, but it is the destruction of its use, and its destruction is a *taking* in as just a sense as the

appropriation of a gravel bank for the repair of a public road would be a taking.

*De Lauder*, 94 Md. at 6–8, 50 A. at 428–29 (citations omitted) (emphasis in original). The MNCPPC also relies on *Mercantile–Safe Deposit & Trust Co. v. Mayor of Balt.*, 308 Md. 627, 521 A.2d 734 (1987), where the Court observed that *"De Lauder* held that an easement for ingress and egress is compensable property. So is a scenic easement, *Hardesty v. State Roads Com'n*, 276 Md. 25, 343 A.2d 884 (1975), and a leasehold interest, *Veirs v. State Roads Comm.*, 217 Md. 545, 143 A.2d 613 (1958)." *Mercantile–Safe Deposit & Trust Co.*, 308 Md. at 640, 521 A.2d at 740. The *Mercantile* Court expanded upon *De Lauder* by holding that "a covenant running with the land ordinarily is a compensable property interest in the condemnation context, at least to the extent it adds measurable value to the land to which it is attached." *Mercantile–Safe Deposit & Trust Co.*, 308 Md. at 641, 521 A.2d at 741. Further, in *Electro–Nucleonics, Inc. v. Wash. Suburban Sanitary Comm'n*, 315 Md. 361, 554 A.2d 804 (1989), we quoted approvingly § 566 of the Restatement of Property, which provides that "[u]pon a condemnation of land subject to the obligation of a promise respecting its use in such manner as to extinguish the interest in the land created by the promise, compensation must be made to those entitled to the benefit of the promise." *Electro–Nucleonics, Inc.*, 315 Md. at 375, 554 A.2d at 811 (quoting RESTATEMENT OF PROPERTY § 566 (1944)).

The MNCPPC also relies on the language of Md.Code, Art. 28 § 5–101, in conjunction with Art. 28 § 5–107, as supporting a distinction between donations for public use made to the MNCPPC (as in the present case), versus other dedications such as those addressed in *McCaw*,[23] with the former granting the MNCPPC ownership of the property so dedicated. Md. Code, Art. 28 § 5–101(a) provides, in pertinent part,

---

**23.** *See McCaw*, 246 Md. at 675, 229 A.2d at 591 ("When a parcel of land is dedicated as a street or for other public use, the owner of the land retains his fee simple interest, subject to an easement for the public."). In *McCaw*, the land at issue was dedicated in 1908 under the

For the purpose of carrying out its general plans for the physical development of the metropolitan district, or any part thereof, the Commission may acquire land or other property located within the district for parks, parkways, forests, streets, roads, boulevards, or other public ways, grounds, or spaces, by means of donations, purchases, or condemnation. The Commission may improve and develop land or other property so acquired by it for these purposes and has the control of the maintenance and operation thereof. . . .

\* \* \*

Md.Code, Art. 28 § 5–101(a). Art. 28, § 5–107 provides

Lands acquired under this article, title to which shall become vested in the State of Maryland or the Maryland–National Capital Park and Planning Commission, shall be held by the State or the Commission for the general benefit of the citizens of the State of Maryland and especially for the benefit of the citizens and residents of Montgomery and Prince George's Counties within the metropolitan district. Title to the lands may not be conveyed by the State, nor may such use be extinguished without the approval by resolution of the Commission.

Md.Code, Art. 28 § 5–107. Thus, the MNCPPC argues that the Deed of Dedication conveyed to it Toll's interest in the LOS Parcel, to which the MNCPPC holds title under § § 5–101 and 5–107 on behalf of the citizens of the State of

procedures provided at the time, before there were provisions for government entities to accept such dedications, and, in fact, before the MNCPPC existed. *See McCaw,* 246 Md. at 685 n. 1, 229 A.2d at 596 n. 1 (Barnes, J., dissenting) ("It will be observed that in the original Act of 1908 there was no provision for approval of the subdivision plat by the County Commissioners, or the Planning Commission or any other public body of like nature. Indeed there was no Planning Commission in existence in 1908. The Commission was not created until April 16, 1927 by the Act of 1927, ch. 448. Under the 1908 Act, the Clerk of the Circuit Court for Prince George's County was *directed* to file the subdivision plat when offered for recordation *by the owner of the land* when there had been compliance with the provisions of the Act.") (emphasis in original).

Maryland, and that the MNCPPC should be entitled to protect that interest by intervening in the Town's condemnation action against Toll.

Unmoved, the Town argues in rebuttal that Art. 28 § 5–101 provides three means by which the MNCPPC may "acquire" property, to include "by means of donations, purchases, or condemnation." Md.Code, Art. 28 § 5–101. In the present case, the Town deems the transfer of interest, if any, that occurred by means of the Deed of Dedication to be merely a dedication, which under *McCaw*, 246 Md. at 675, 229 A.2d at 591, grants the MNCPPC only an easement for public use, and absolutely no ownership interest, with Toll retaining title in fee simple to the LOS Parcel. *See McCaw*, 246 Md. at 675, 229 A.2d at 591 ("When a parcel of land is dedicated as a street or for other public use, the owner of the land retains his fee simple interest, subject to an easement for the public.").

Second, the Town proclaims that Toll, in fact, has not conveyed the LOS Parcel to the MNCPPC because of the "unwind" provision contained within the Deed of Dedication. As noted, *supra*, the "Unwind of Dedication" clause of the Deed of Dedication provides that the dedication will be terminated automatically if "the Preliminary Plan expires or otherwise terminates for any reason and, at the time of such expiration or termination, a final site plan and final plat of subdivision of all of Phase I ... have not been finally approved in substantial accordance with the Preliminary Plan." The clause further reserves to Toll the right to terminate the dedication "if the site plan for all of Phase I has not been finally approved in substantial accordance with the Preliminary Plan on or before September 30, 2007." Based on the "unwind" provision in the Deed, the Town raises two intriguing issues, which, if not moot by now,[21] may figure later in the case on remand or if a final judgment is appealed.

The first is that the "unwind" provision negates the existence of an intent on the part of Toll to dedicate the LOS

---

**24.** On 1 October 2008 (after the Town's brief was filed in this Court, but before oral argument), the MNCPPC filed with this Court a Motion to

Parcel to the MNCPPC. In *Harlan v. Town of Bel Air*, we stated the general rule in Maryland that "an intent on the part of an owner of land to dedicate [the land] to public use is absolutely essential to constitute a dedication." *Harlan v. Town of Bel Air*, 178 Md. 260, 265, 13 A.2d 370, 372 (1940) (citing *Pitts v. Mayor of Balt.*, 73 Md. 326, 332, 21 A. 52, 53 (1891); *Tinges v. Mayor of Balt.*, 51 Md. 600, 609 (1879)). Thus, the Town argues that "[g]iven the 'unwind' provision there [was] not ... a true dedication, and what purports to be a dedication is illusory." Joining in the Town's argument is *Amicus Curiae*, the Maryland Municipal League ("League").[25]

---

Take Judicial Notice of Adjudicative Facts. In that motion, the MNCPPC, among other things, asked us to take judicial notice of the fact that on 31 July 2008 the Montgomery County Planning Board adopted Resolution 08–78, which, the MNCPPC asserts, is "the formal resolution issued to approve Toll's certified site plan application for the Development, and also evidences that Toll has complied with the relevant condition[, Condition 15 of Preliminary Plan of Subdivision No. 1–02022,] by completing its dedication to the Commission of the [LOS Parcel]." Relating specifically to the LOS Parcel, Resolution 08–78 states that "[l]and for dedication to be conveyed by time of record plat, except the Legacy Open Space Natural Area that has already been transferred by [Toll] to M[ ]NCPPC pursuant to Preliminary Plan conditions of approval." Were we to grant the MNCPPC's motion (we do not) and consider Resolution 08–78, we would be unable to conclude, on this basis alone, that the "unwind" provision in the dedication has been satisfied and rendered moot by the subsequent action. The Deed of Dedication was executed between Toll and the MNCPPC, and, in the "unwind" provision, there are conditions that could present conflicting interests between Toll and the MNCPPC. Toll is not a party to the case now before this Court and has not joined or acquiesced in the representations of the MNCPPC's motion. We are unable to ignore the possibility that there may be occasions in which Toll and the MNCPPC may disagree over whether Toll's development plans are in "substantial accordance" with the approved Preliminary Plan, even in the absence of a judicial review proceeding flowing from the action on the site plan. Moreover, the materials submitted with the MNCPPC's motion do not speak to whether a final plat of subdivision has been approved and/or filed for Phase I of the development (*see supra* at 24), also required as a condition of the "unwind" provision of the Deed of Dedication. Thus, without more, we fail to see how the "adjudicative facts" that the MNCPPC desires us to take note of moot the serious questions raised here by the Town as to the MNCPPC's interest in the LOS Parcel.

25. The League's argument is divided into two parts, one relating to statutory dedication and the other to common law dedication. As to

The second issue interposed by the Town, due to the

statutory dedication, the League directs us to *McCaw* for the rule that a statutory dedication occurs upon compliance with the requirements of a statute. The language of *McCaw* the League directs us to is: *"Whitting-ton[ v. Good Shepherd Evangelical Lutheran Church,* 236 Md. 185, 202 A.2d 751 (1964) ], therefore, establishes the rule, which we affirm, that under the statute, the dedication to the public is complete and the interest of the public has vested when the subdivision plat is filed." *McCaw,* 246 Md. at 673, 229 A.2d at 589–90 (footnote omitted). In the present case, the League argues, because § 50–15(a) of the County Code requires that "[w]hen a plat is recorded, land designated on the plat as a ... public park or square, or other area dedicated to public use must be dedicated in perpetuity to public use," the absence of a recorded plat forecloses a completed statutory dedication here. Asserting that "[s]ection 50–15(a) of the Montgomery County Code parallels the Prince George's County statute at issue in *McCaw,* which this Court interpreted as rendering the recordation of a plat dedicating land to public use a completed statutory dedication," and noting in this case the absence of a recorded plat by Toll, the League argues that a statutory dedication of the LOS Parcel from Toll to the MNCPPC has not occurred.

On the common law dedication side, the League looks to this Court's decision in *City of Annapolis v. Waterman,* 357 Md. 484, 745 A.2d 1000 (2000), for the rule that common law dedications operate by way of equitable estoppel. *See Waterman,* 357 Md. at 504–05, 745 A.2d at 1010-11 (" 'Dedication' is a setting apart of land for the public use, and may be either statutory or at common law, the distinction between a statutory and a common-law dedication being that the statutory dedication operates as a grant, while the common-law dedication operates by way of estoppel in pais ....' " (quoting *Priolo v. City of Dallas,* 257 S.W.2d 947, 953 n. 2 (Tex.Civ.App.1953))). In *Waterman,* we noted the general elements of common law dedications as follows:

> Generally, common-law dedications are voluntary offers to dedicate land to public use, and the subsequent acceptance, in an appropriate fashion, by a public entity. Common-law dedications are not mandated by statute. The offers are generally, although not exclusively, made by showing roads, parks or similar facilities on plats without any limitations on dedication, and the recording of those plats. Generally, acceptance is made by an express recorded document or by the appropriate entity assuming control and maintenance of the property offered. With acceptance, common-law dedication is complete.

*Waterman,* 357 Md. at 503–04, 745 A.2d at 1010. The League argues that due to the "unwind" provision in the Deed of Dedication, Toll has not taken any final action or made any final representation that it has dedicated unequivocally the LOS Parcel to the MNCPPC, with the result that, until final subdivision approval in accordance with the "unwind" provision in the Deed and some action on the part of the MNCPPC indicating final acceptance of the dedication occurs, Toll has not dedicated the LOS Parcel to the MNCPPC.

"unwind" provision in the Deed, is a hybridized off-spring of the League's statutory and common law dedication analyses.[26] The Town argues that the MNCPPC has not received an interest in the LOS Parcel via dedication from Toll because the MNCPPC cannot compel Toll to follow through with the dedication. First, the Town notes that the conditional approval of the preliminary plan of subdivision, and Condition 15 in particular, was the product of the Planning Board, and not the MNCPPC. The Montgomery County Planning Board is an entity distinct from the MNCPPC. *See* Md.Code, Art. 28 § 7–111(a) ("The members of the Commission appointed by the governing bodies of each county are designated the Montgomery County Planning Board and the Prince George's County Planning Board, respectively. They are responsible for planning, platting, and zoning functions primarily local in scope, as distinguished from the regional planning functions of the Commission relating to or affecting the regional district as a planning unit. . . ."); County Code, § 50–4 ("This chapter [entitled Chapter 50, Subdivision of Land] shall be administered by the county planning board."). Under the County Code, an approved subdivision plan is only a predictor of possible future development, subject to the discretion of the developer/applicant or successor in interest to pursue further the development and subdivision process under the approved plan. *See* County Code, §§ 50–34 to –35. The Town asserts that because the MNCPPC was not the approving authority of Toll's preliminary development plans, including Condition 15, and because under Chapter 50 of the County Code there is no means by which the Planning Board may compel Toll to follow through with the development at the plan-approval stage, including satisfaction of Condition 15, there is an insufficient basis on which to find that the MNCPPC acquired a colorable interest in the LOS Parcel pursuant to the Deed of Dedication.

First, the Town's and the League's reliance on *McCaw* is unavailing. In *McCaw,* the Court was faced with the issue of whether a recorded subdivision plat, on which land was dedi-

---

**26.** *See* n. 25, *supra.*

cated to public use, may be abandoned under a law that provided that such plats may be abandoned only if no injury will be suffered by persons other than the developers. *McCaw*, 246 Md. at 666, 229 A.2d at 585. In 1908, the original owner and developer of a tract of land in Prince George's County subdivided the land and duly recorded the plans, which included areas dedicated for public use for streets. *McCaw*, 246 Md. at 666, 229 A.2d at 586. In 1963, McCaw purchased a tract of land, which included the 1908 subdivision, and in 1965 petitioned the Circuit Court for Prince George's County for leave to abandon the previously recorded plats. *McCaw*, 246 Md. at 666–67, 229 A.2d at 586. We held that the MNCPPC, the only party to oppose the abandonment, had standing to argue for continuation of the dedication, and that there was a sufficient showing of possible damage to the public interest to prevent approval of McCaw's proposed abandonment. *McCaw*, 246 Md. at 672, 676–77, 229 A.2d at 589, 592–93.

The procedure through which the land was dedicated in 1908 did not require the approval, or even the involvement, of any governmental entity, other than the Clerk of the Circuit Court of the plats to be recorded (who was obliged to record preferred plats as a relatively ministerial function). *See McCaw*, 246 Md. at 685 n. 1, 229 A.2d at 596 n. 1 (Barnes, J., dissenting) ("It will be observed that in the original Act of 1908 there was no provision for approval of the subdivision plat by the County Commissioners, or the Planning Commission or any other public body of like nature. Indeed there was no Planning Commission in existence in 1908. The Commission was not created until April 16, 1927 by the Act of 1927, ch. 448. Under the 1908 Act, the Clerk of the Circuit Court for Prince George's County was *directed* to file the subdivision plat when offered for recordation *by the owner of the land* when there had been compliance with the provisions of the Act.") (emphasis in original). The developer/owner would simply submit a plat to the Clerk and, upon recording, the plat would be, in and of itself, the valid dedication. *See McCaw*, 246 Md. at 676, 229 A.2d at 591 ("Here, the public

easement effected by the recording of the subdivision plat is for the public use of streets.").

In the statutory scheme of the case *sub judice*, the procedure through which a dedication is arrived at and perfected, and the implications therefrom, are substantially different from that in *McCaw*. In *McCaw*, because the developer was the stimulus and source for the dedication, and because such dedications were more or less a functional part of the developer's own plans, the rule from *McCaw* relied on here that "[w]hen a parcel of land is dedicated as a street or for other public use, the owner of the land retains his fee simple interest, subject to an easement for the public," *McCaw*, 246 Md. at 675, 229 A.2d at 591, was appropriate to the dedication process addressed in that case. In the present case, the subdivision regulatory scheme, including provisions for dedications, was not solely in the hands of the developer. Rather, the Planning Board, the governmental entity charged with approving subdivision plans, imposed the relevant dedication as a condition to be complied with in order for the particular plan proposed by Toll to be approved. More specifically, the dedicated land was to be conveyed to a specific governmental entity, the MNCPPC, for its specific park and planning functions, and not simply for the more general public use as in *McCaw*. Based on these considerations, we find that the rule announced in *McCaw* is not necessarily one of general application to all public dedications and specifically is inapplicable to the present case.[27]

27. *McCaw* also was relied upon by the League for its proposition that a statutory dedication occurs only upon compliance with a statute. In *McCaw*, we interpreted compliance with the statute to have occurred only when the plat was filed. *See McCaw*, 246 Md. at 676, 229 A.2d at 591 ("Here, the public easement effected by the recording of the subdivision plat is for the public use of streets."). The League would have us read County Code, § 50–15(a)'s language, "[w]hen a plat is recorded, land designated on the plat as a ... public park or square, or other area dedicated to public use must be dedicated in perpetuity to public use," as the equivalent of the statutory requirement in *McCaw*, such that the absence of a recorded plat by Toll here frustrates the completion of a statutory dedication of the LOS Parcel. If recording

the plat showing land dedicated to public use under County Code, § 50–15(a) were the only means by which Toll could effectuate the dedication, we might agree; however, a recorded plat is not the only means by which Toll may have consummated the dedication contemplated by the subdivision approval in this case.

In *McCaw,* the land dedicated was for general public use as streets, under the only means through which such a dedication then could be achieved, the recording of the plat with the Clerk of the Circuit Court. At that time, for the developer to complete a statutory dedication, everything depended entirely on the developer's initiative. *See McCaw,* 246 Md. at 685 n. 1, 229 A.2d at 596 n. 1 (Barnes, J., dissenting). Although we recognize that the opportunity provided by County Code, § 50–15(a), provides one means to effect statutory dedications by recording subdivision plats, similar to the means in *McCaw,* in the present case, there are other statutory means through which Toll's dedication might be effectuated other than under County Code, § 50–15(a). Md.Code, Art. 28 §§ 5–101 and -107 provide that the MNCPPC "may acquire land or other property," and that for "[l]and acquired under this article, title ... shall become vested in the State of Maryland or the [MNCPPC]." Md.Code, Art. 28 §§ 5–101, –107. Thus, contrary to the League's argument that a statutory dedication could be achieved only through compliance with County Code, § 50–15(a), we view Art. 28 §§ 5–101 and –107 as providing other means through which a statutory dedication may be achieved by Toll in the present case. We note that the ultimate determination of whether the statutory dedication was completed in this case would require us to decide whether the statutory dedication was completed upon the transfer of the deed between the dedicator and the MNCPPC, in light of Art. 28 § § 5–101 and –107, or upon the subsequent filing of the plat under County Code, § 50–15(a) showing the land dedicated to public use. Because of the minimal threshold finding required to be made under Md. Rule 2–214, *see infra,* however, we do not reach a final merits determination in this case.

Similarly, the League's argument that the dedication attempted by Toll does not satisfy the requisite intent to accomplish a common law dedication, and the MNCPPC's subsequent acceptance of that intent, is misplaced. In *Waterman,* we specifically distinguished common law dedications from subdivision dedications:

> [I]t is important to understand that not all conditions attached to subdivision approvals or imposed on approved subdivisions are "subdivision dedications," and that no such conditions are "common-law dedications." Subdivision dedications and common-law dedications are different creatures as well.
>
> Dedications required under subdivision regulations should be distinguished from common law dedications. Common law dedication involves an offer to dedicate and a corresponding acceptance by a local government. Under common law dedication a developer is estopped from later questioning the acceptance. In subdivision regulation dedication, however, questions of legislative authority and constitutionality arise.

*Waterman,* 357 Md. at 503, 745 A.2d at 1010 (quoting Julian Conrad Juergensmeyer & Thomas E. Roberts, *Land Use Planning and Control*

Second, relating back to the second requirement for intervention under Md. Rule 2–214, we must resolve at this stage of the litigation only whether the MNCPPC "claims an interest relating to the property or transaction that is the subject of the action," and not whether it "owns" or "holds" such an interest. Although the authorities and arguments presented by the Town that the MNCPPC presently does not "own" an interest in the LOS Parcel ultimately may carry the day, we nonetheless find that the MNCPPC is situated sufficiently to "claim" an interest in the LOS Parcel. There is authority to the effect that, in dedicating land, the dedicator may impose such reasonable conditions, restrictions, and limitations as the dedicator may see fit, so long as the conditions are not repugnant to the dedication or against public policy. *City of Kechi v. Decker,* 230 Kan. 315, 634 P.2d 1099, 1103 (1981); *Callahan v. Ganneston Park Dev. Corp.,* 245 A.2d 274, 278 (Me.1968); *Roaring Springs Town–Site Co. v. Paducah Tel. Co.,* 109 Tex. 452, 212 S.W. 147, 148–49 (1919); *Lynchburg Traction & Light Co. v. City of Lynchburg,* 142 Va. 255, 128 S.E. 606 (1925); *N. Spokane Irrigation Dist. No. 8 v. County of Spokane,* 86 Wash.2d 599, 547 P.2d 859, 861 (1976).

In the present case, the purpose for which the Deed of Dedication was delivered by Toll was purportedly to satisfy Condition 15 of the subdivision approval in order for Toll to be able to move forward in pursuing the development of its property under Preliminary Plan No. 1–02022. Prior to the

---

*Law* 315 (1998)). We further distinguished subdivision dedications from subdivision conditions:

> A subdivision dedication can be distinguished from a condition imposed on a subdivision approval (whether a reservation or otherwise) depending on the intended recipient. A subdivision dedication requires a developer to give the public the right to use a portion of his property or gives one of the incidents of ownership (e.g., an "in lieu" fee) to the public at large to use. A subdivision condition, like the provision at issue in this case, merely limits the method in which a property owner may thereafter use the property.

*Waterman,* 357 Md. at 506–07, 745 A.2d at 1011–12. In light of this guidance, we find the League's common law dedication analysis persuasive, but not binding, in the present case because the present case involves a subdivision dedication.

issuance of the subdivision approval, negotiations had occurred between Toll and the Town for several years concerning the preservation of the LOS Parcel as a part of the development of the entire tract. It was logical and reasonable, therefore, for Toll to protect itself against a situation in which it would have dedicated irrevocably the LOS Parcel to the MNCPPC, and yet lost its ability to carry out its development opportunity because of the expiration of the Preliminary Plan approval. Further, the Deed of Dedication contained the following provision requiring Toll and the MNCPPC respectively to work toward final approval of Phase I:

5. Processing of Phase I Site Plan and Plat.

Prior to the date of this Agreement, Toll filed with the Commission its proposed site plan for Phase I. At a future date, Toll intends to file with the Commission its proposed final plat of subdivision for Phase I. From and after the date of this Agreement with respect to the Phase I site plan and from and after the date of filing with respect to the Phase I plat, the Commission shall proceed expeditiously and in good faith, with reasonable diligence, to review and process Toll's submissions so that the Phase I site plan and Phase I plat may be approved by the Planning Board at the earliest practicable time.

Therefore, we disagree with the Town's assertions that the "unwind" provision in the Deed of Dedication necessarily precludes the possibility that dedication of the LOS Parcel by Toll to the MNCPPC may have been achieved in the delivery of that document. We do not need, however, to determine here whether the dedication was achieved. We conclude only that there is a sufficient legal and factual basis upon which to conclude that the MNCPPC is or could be bound by a judgment in the condemnation action.

### b.

The Town also advances the notion that the MNCPPC was denied intervention properly under the Maryland doctrine of *lis pendens*. The doctrine of *lis pendens* is the subject of Md. Rule 12–102, which provides, in pertinent part,

(a) Scope. This Rule applies to an action filed in a circuit court or in the United States District Court for the District of Maryland that affects title to or a leasehold interest in real property located in this State.

(b) Creation—Constructive Notice. In an action to which the doctrine of lis pendens applies, the filing of the complaint is constructive notice of the lis pendens as to real property in the county in which the complaint is filed. In any other county, there is constructive notice only after the party seeking the lis pendens files either a certified copy of the complaint or a notice giving rise to the lis pendens, with the clerk in the other county.

\* \* \*

Md. Rule 12–102. The first issue we must address, which appears novel in Maryland law, is whether the doctrine of *lis pendens* applies to a condemnation action.

We previously have stated that "[i]n our state, the *lis pendens* doctrine has its foundations in common law and remains mostly there. In our state the only procedural reference to *lis pendens* is set out in Md. Rule 12–202, which contains no substantive modification of the common law." *Greenpoint Mortgage Funding, Inc. v. Schlossberg,* 390 Md. 211, 223, 888 A.2d 297, 304 (2005). In *Greenpoint,* we quoted approvingly from the intermediate appellate court's opinion in *Angelos,* that

"Lis pendens literally means a pending action; the doctrine derives from the jurisdiction and control which a court acquires over property involved in an action pending its continuance and until final judgment is entered. Under the doctrine, one who acquires an interest in the property pending litigation relating to the property takes subject to the results of the litigation. *It is clear that the doctrine has no application except where there is a proceeding directly relating to the property in question, or where the ultimate interest and object of the proceeding is to subject the property in question to the disposal of a decree of the court.*" (Emphasis added.)

*Greenpoint Mortgage Funding,* 390 Md. at 223, 888 A.2d at 304–05 (quoting *Angelos v. Md. Cas. Co.,* 38 Md.App. 265, 268, 380 A.2d 646, 648 (1977)).

Condemnation actions in Maryland are governed by Title 12 of the Real Property Article and Chapter 200 of Title 12 of the Maryland Rules. *See* Md.Code, Real Property § 12–101 (2003 Repl.Vol. & Supp.2008) ("All proceedings for the acquisition of private property for public use by condemnation are governed by the provisions of this title and Title 12, Chapter 200 of the Maryland Rules."). In particular, Md. Rule 12–201 provides that "[t]he rules in this Chapter govern actions for acquisition of property by condemnation under the power of eminent domain." Md. Rule 12–201. Md. Rule 12–205 sets out the required elements of a complaint for condemnation, providing

An action for condemnation shall be commenced by filing a complaint complying with Rules 2–303 and 2–305 and containing:

(a) The names of all persons whose interest in the property is sought to be condemned. If any person is a nonresident or not known, that fact shall be stated. If any person is the unknown heir of a decedent, that person shall be described as the unknown heir of _____, deceased.

(b) A description of the property sought to be condemned. If the subject matter of the action is real property, the description shall be:

(1) by lot and block or square when an entire lot, block, or square shown on a subdivision map, plat, or record is sought to be condemned; or

(2) by metes and bounds when an entire tract is sought to be condemned; or

(3) by metes and bounds clearly and legibly set forth on a plat showing the area and stating the amount of land sought to be condemned. The plat shall set forth the beginning point for the description, referenced to an existing marker, call, monument, or point outside the area sought to be condemned, in a recorded deed or plat identified by liber and folio. The deed or plat shall be in the chain of title to

the property sought to be condemned, but if no marker, call, monument, or point can be found in the chain of title, reference may be made to the chain of title of adjoining property.

(c) A statement of the nature of the interest that the plaintiff seeks to acquire by the proposed condemnation.

(d) A statement of the purpose for which the property is sought to be condemned.

(e) A statement that there is a public necessity for the proposed condemnation.

(f) A statement that the parties are unable to agree or that a defendant is unable to agree because that defendant is unknown or under legal disability.

(g) A statement of the amount of any money paid into court and the date of the payment.

(h) A statement of the date of taking if a taking has occurred.

(i) A request that the property be condemned.

Md. Rule 12–205. After appropriate discovery has occurred, Md. Rule 12–206, and upon conclusion of a trial in accordance with Md. Rule 12–207, the court shall enter a judgment determining whether a right to condemn the property exists. Md. Rule 12–209. Due to the specificity of the requirements and guidelines set out in Chapter 200 of Title 12, and the purpose and effect of condemnation proceedings generally, it appears likely that condemnation actions in Maryland satisfy the *lis pendens* criteria set forth in *Greenpoint Mortgage Funding* that there be a "proceeding directly relating to the property in question," or a proceeding in which "the ultimate interest and object . . . is to subject the property in question to the disposal of a decree of the court." *Greenpoint Mortgage Funding*, 390 Md. at 223, 888 A.2d at 304–05; *see also DeShields v. Broadwater*, 338 Md. 422, 435, 659 A.2d 300, 306 (1995) ("*Lis pendens* has no applicability, therefore, except to proceedings directly relating to the title to the property transferred or in which the ultimate interest and object is to

subject the property in question to the disposal of a decree of the court." (citing *Feigley v. Feigley,* 7 Md. 537, 563 (1855))).

█ The Town, and the League as *Amicus,* point to several other jurisdictions which have addressed this issue, all of which concluded that the doctrine of *lis pendens* is applicable to condemnation actions. *See Wilkinson v. District of Columbia,* 22 App. D.C. 289, 296 (1903) ("But by the filing of the petition for condemnation, and the assessment of benefits and damages, and the service of notice thereof on the parties then in interest, the lien undoubtedly attached to the property as it then stood, and with the divisions and subdivisions that then existed."); *Mills v. Forest Pres. Dist.,* 345 Ill. 503, 178 N.E. 126, 130 (1931) ("The effect of filing a petition for condemnation creates no different situation from that produced by the beginning of any other suit involving a lien upon or claim of title to the land superior to that of an apparent owner of the title in possession, whether he has an unincumbered title in fee or not. The apparent owner in such a case, however good his title, holds it subject to the result of the suit. . . ."); *Lake Cent. Sch. Corp. v. Hawk Dev. Corp.,* 793 N.E.2d 1080, 1089 (Ind.Ct.App.2003) (finding that although Indiana General Assembly enacted statute providing for formal constructive notice of condemnation proceedings, common law doctrine of *lis pendens* is still applicable to condemnation actions); *Plumer v. Wausau Boom Co.,* 49 Wis. 449, 5 N.W. 232, 234 (1880) (finding that an interest in property purchased while the property was subject to a pending condemnation action was subordinate to outcome of judgment regarding condemnation). No party or *amici* notes a case from any jurisdiction in which a court concluded that the doctrine of *lis pendens* is inapplicable to a condemnation action. Thus, because Md. Rule 12–102 provides generally that *lis pendens* applies to "an action . . . filed in a circuit court . . . that affects title to . . . real property located in this State," and in light of the apparent support at common law, we agree with the Town that the Maryland doctrine of *lis pendens* is applicable to condemnation actions.

 Having resolved that the Maryland doctrine of *lis pendens* is applicable to the Town's condemnation action, the Town would have us further determine that, under *Stockett v. Goodman,* 47 Md. 54 (1877), and *Sinclair v. Auxiliary Realty Co.,* 99 Md. 223, 57 A. 664 (1904), the application of *lis pendens* to the present case operates as a bar to the MNCPPC's participation as a party in the Town's condemnation action. We shall decline to do so.

In *Stockett,* this Court addressed the issues of which persons were appropriate parties to an action in the circuit court, and what real property interests each party respectively could assert, where a grantor-appellant (Stockett) had granted or deeded numerous interests in the same real property to multiple persons. In 1874, the appellee in the case filed a complaint in equity in the circuit court, as administratrix of the estate William R. Goodman, seeking to foreclose on certain mortgages executed by Stockett during the lifetime of Goodman. *Stockett,* 47 Md. at 57–59. The complaint alleged that Stockett had given Goodman mortgages on two different properties to secure payment of debts. *Stockett,* 47 Md. at 57–59. In defending against the foreclosure actions, Stockett asserted two main defenses: (a) that as to a certain portion of each of the lands mortgaged, he had only a remainder in fee after the expiration of a life estate, so that he could not have mortgaged any greater estate in those lands; and (b) that prior to execution of one of the mortgages to Goodman, Stockett conveyed a part of the real estate to John Wolf, and thus the portion conveyed was exempt from the mortgage later granted to Goodman. *Stockett,* 47 Md. at 57–59. In 1875, about a year after commencement of the foreclosure action by the administratrix, Stockett, joined by his wife, conveyed all of his property to two trustees. *Stockett,* 47 Md. at 57–59. In February 1876, the trustees filed a petition in the circuit court alleging that Stockett's wife had not joined in the prior mortgages executed by him. *Stockett,* 47 Md. at 57–59. Thus, the trustees asserted that, because the wife never joined, her contingent rights of dower were not conveyed in any of the mortgages until the deed of trust, and that, as a

result, they held the wife's contingent rights. *Stockett,* 47 Md. at 57–59. The circuit court denied the petition. *Stockett,* 47 Md. at 60.

In affirming the denial of the trustees' petition, the Court found

> After the commencement of the proceedings in this case and the filing of the answer, the defendant Stockett, on the 13th of April, 1875, executed to certain trustees, for the benefit of his creditors, a deed, in which his wife united, of all his property, except certain reservations to her in consideration of the surrender of her right of dower. On the 8th day of February, 1876, these trustees filed a petition, and with it their deed as an exhibit, asking to be admitted as parties defendants in this suit. The Circuit Court refused their application, and passed an order dismissing their petition. We can see no reason why they should have been admitted as parties. They are assignees under a voluntary deed made to them *pendente lite,* and subject to all the equities of the defendant. They stand in no better position than the person under whom they claim, and can set up no defense which he cannot. Their rights are entirely in subjection to his, and to admit them as parties now would delay the complainant's proceedings, and could not change the result as against this defendant. If assignees *pendente lite* can claim the right of becoming parties, the litigation, by successive assignments, might be rendered interminable. *Sedgwick v. Cleaveland,* 7 Paige, 290; Story's Eq. Pl. sec. 156.

*Stockett,* 47 Md. at 60.

A similar scenario presented in *Sinclair.* In April 1901, Annie Lampkin filed a bill of complaint in the circuit court against Elizabeth Smith and Frank St. Clair Smith, seeking to vacate a deed made by Elizabeth to Frank on the ground that the transaction was fraudulent as to Lampkin's rights as a creditor of Elizabeth. *Sinclair,* 99 Md. at 225, 57 A. at 664–65. Elizabeth answered denying an intent to defraud Lampkin. Frank filed an answer denying the indebtedness of Elizabeth to Lampkin. *Sinclair,* 99 Md. at 225, 57 A. at 665.

While the action was pending before the circuit court, in May 1902, the Auxiliary Realty Company ("Auxiliary") filed a petition alleging that, in March 1902, George Wiegal conveyed the property at issue to Auxiliary, that Wiegal had acquired title to the property by deed of 3 January 1902 from Frank, and that when Wiegal and Auxiliary both acquired their interests, each was a good faith purchaser without knowledge of the pending proceeding between Lampkin and the Smiths. *Sinclair*, 99 Md. at 226, 57 A. at 665. The case reached this Court for review of a procedural ruling of the circuit court sustaining Auxiliary's demurrer[28] to Lampkin's original bill of complaint and to A. Leftwich Sinclair's petition to allow Sinclair to participate as a party plaintiff in the action.[29] *Sinclair*, 99 Md. at 228, 57 A. at 666.

---

**28.** Perhaps our newer generations of lawyers do not know what a "demurrer" was under former rules and pleading requirements in Maryland. We pause to supply some background. At common law, the demurrer was a procedural pleading filed by defendants seeking to have a plaintiff's complaint dismissed for some legal deficiency affirmatively appearing in the complaint. As we described in *Goldsmith v. Mead Johnson & Co.*, 176 Md. 682, 7 A.2d 176 (1939),

> A demurrer is founded upon some point of law which goes to the absolute denial of the relief sought, and asks the court to determine whether the defendant should be compelled to answer the complainant's bill. *Fletcher, Eq. Pl. & Pr.*, 233. So a demurrer in equity in this state is founded exclusively upon the matter apparent upon the face of the bill, and admits the truth of the complainant's whole case, and denies that he is in equity entitled to relief, even supposing all the facts stated to be true. *Barroll, Md. Chan. Pr.*, 111. Matters of defense not affirmatively appearing on the face of a bill should be taken advantage of by answer, rather than by demurrer. *Riley v. Hodgkins*, 57 N.J.Eq. 278, 41 A. 1099; *Fenwick v. Sullivan*, 102 Vt. 28, 145 A. 258.

*Goldsmith*, 176 Md. at 689–90, 7 A.2d at 179–80. Maryland Rule 2–322(b)(2), providing for the defense by motion to dismiss for failure to state a claim upon which relief can be granted, is the modern equivalent of the demurrer. *See Ronald M. Sharrow, Chartered v. State Farm Mut. Auto. Ins. Co.*, 306 Md. 754, 768, 511 A.2d 492, 499 (1986) ("Under Md. Rule 2–322, a motion to dismiss for failure to state a claim serves the same function as the demurrer under former Rules 345 and 371 b.") (citations omitted).

**29.** Sinclair petitioned to be recognized as a party plaintiff as administrator of Annie E. Lampkin's estate, as Lampkin had died during the

One of the points raised in Auxiliary's demurrer was that because Elizabeth Smith had passed away, even if she had fraudulently conveyed the property to Frank St. Clair Smith during her life, her death caused whatever interest she retained in the property to vest by inheritance in Frank as her heir, thus abating the fraudulent conveyance action and, with that, the need for Lilian St. Clair Brady's participation [30] as a defendant in the action. *Sinclair*, 99 Md. at 231, 57 A. at 667. The Court of Appeals disagreed with Auxiliary's assertion, and found that under statutory law at the time Lilian St. Clair Brady, as heir of Frank St. Clair Smith, retained the right to assert whatever defenses Frank had to the original action of fraudulent conveyance. *Sinclair*, 99 Md. at 233, 57 A. at 668.

In rejecting Auxiliary's assertion that Lilian St. Clair Brady's participation in the proceedings was not necessary because Frank St. Clair Smith's later (than Elizabeth's) death rendered the fraudulent conveyance claim moot, we recognized the significance of the participation of either Frank or Lilian in the proceedings, as opposed to Auxiliary, because the initial bill of complaint was premised on the fraudulent conveyance action. The Court stated

It cannot be doubted, especially under the *Act of 1892*, that the heirs at law of a deceased defendant may be brought in upon petition when the subject of the controversy is real estate in which the heir at law may have an interest. If this controversy had not been complicated by the conveyance to Wiegal and by the deed from Wiegal to [Auxiliary], it would hardly be suggested that upon the death of Elizabeth Smith the suit could not have proceeded against Frank St. Smith, the grantee. And it is equally clear that upon the death of Frank St. Clair Smith, his heir at law would have been the

pendency of the action before the circuit court. *Sinclair*, 99 Md. at 226, 57 A. at 665. Elizabeth Smith and Frank St. Clair Smith also died during the pendency of the action in the circuit court, and upon a petition by Sinclair, Frank St. Clair Smith's heir, Lilian St. Clair Brady, was made a party defendant to Lampkin's claim of fraudulent conveyance. *Sinclair*, 99 Md. at 227, 57 A. at 665.

**30.** *See supra* n. 29 and accompanying text.

proper party to have succeeded him, as defendant on the docket. If the *Act of 1892* is operative at all it would certainly have applied to that situation, and under it Lilian St. Clair Brady could have been made a party defendant on a short petition as therein provided, without the necessity of filing a bill of revivor or an original bill in the nature of a bill of revivor. If that be so, how did the conveyance from Wiegal to [Auxiliary] alter the situation? Both Wiegal and [Auxiliary] were purchasers *pendente lite* and consequently are not necessary parties to the proceeding.

*Sinclair*, 99 Md. at 232, 57 A. at 667. The Court then quoted from *Stockett*, 47 Md. at 60, *infra*, to support the notion that Wiegal and Auxiliary were not indispensable parties in the proceedings because whatever interests they received in the property, if any, were contingent upon resolution of the fraudulent conveyance claim against the heir of Frank St. Clair Smith. *See Sinclair*, 99 Md. at 232–33, 57 A. at 667–68.

The Town emphasizes the language quoted above from *Stockett*, as repeated and applied in *Sinclair*, to support the argument that the Maryland doctrine of *lis pendens* bars the MNCPPC's participation as a party defendant in the Town's condemnation action. We are not persuaded. In both *Stockett* and *Sinclair*, the core issues presented to the circuit courts centered on the initial transaction in a series of transactions involving the same land. The parties whose claims were subject to the application of *lis pendens* were recipients of potential interests through the transactions subsequent to, and completely independent of, the ones being challenged in the original action. In *Stockett*, the trustees sought to intervene to assert their rights to the property in an action in which the dispute between the original parties concerned whether the owner of the property had conveyed previously, before the trustees were ever involved, any and all interests he held in the property. Similarly, in *Sinclair*, Auxiliary sought to intervene in an action between a creditor and grantor over whether the conveyance between the grantor and first grantee was fraudulent, but where Auxiliary did not receive its potential interest in the property until two conveyances thereafter.

We interpret *Stockett* and *Sinclair* not as establishing absolute bars to participation by persons receiving potential interests in real property *pendente lite,* but as preventing, regardless of the doctrine of *lis pendens,* persons from participating as parties unnecessarily in actions in which their interests in the property in question derive entirely from transactions subsequent to, and completely independent of, the transaction called into question in the original action, such that those persons fail to add any substantive interests or claims of their own that relate to the original transaction that are not represented already by the original parties.[31] This interpretation is consistent with *Stockett* because in that case the Court made clear that much of the rationale for its affirmance of the denial of the trustees' bid to participate was due to the Court's recognition that the trustees would not add substantive claims or defenses not pursued already, or available to be pursued, by the plaintiff and defendant. The Court stated that "[t]he complainant in this case has proceeded with regularity to obtain a decree, and we find nothing in the record which should subject her to further delay and costs. We will therefore affirm the decree of the Circuit Court." *Stockett,* 47 Md. at 60. This interpretation is also consistent with *Sinclair,* where the Court recognized that, although Auxiliary may not be a necessary party to the proceedings in the circuit court, that does not amount to an automatic bar to Auxiliary's participation in the proceedings in the circuit court. Rather, Auxiliary was permitted to continue to pursue its claims related to the property in the circuit court:

---

**31.** Our interpretation is consistent with the current Md. Rule 2–214, the one at issue in this case, governing interventions. In *Stockett,* the Court's affirmance of the denial of the trustees' petition, thus excluding their participation, was based on the Court finding that any claim or interest the trustees' might assert was represented adequately by existing parties. *See Stockett,* 47 Md. at 60 ("They stand in no better position than the person under whom they claim, and can set up no defense which he cannot. Their rights are entirely in subjection to his, and to admit them as parties now would delay the complainant's proceedings, and could not change the result as against this defendant."); *see also* Md. Rule 2–214.

Independently of all that has just been said on this branch of the case, [Auxiliary] is, upon its own application, in point of fact, an actual party to the cause. It came in by petition. It was made a party at its own request and surely it is in no condition to complain, after thus becoming a party, that it was not made a party upon the motion or petition of the plaintiff. Being a party, it may make its defence as fully as though it had been brought in upon the petition of the plaintiff and it cannot be prejudiced by joining with it, as a co-defendant, the heir at law of Frank St. Clair Smith, who in his lifetime was one of the original defendants.

*Sinclair,* 99 Md. at 233–34, 57 A. at 668.

That we have not interpreted the Maryland doctrine of *lis pendens* to pose a substantive bar to participation in an action by a purported subsequent transferee of the subject property is also implicit in *Greenpoint Mortgage Funding.* In that case, Judge Cathell explained the apparent origin of the doctrine of *lis pendens* and its intended application in litigation:

Lis pendens, a doctrine with deep roots in the English courts of chancery, apparently can be traced to around 1618 during Sir Francis Bacon's time serving as Lord Keeper of the Great Seal. This doctrine is discussed in a multitude of cases and is formally defined as:

> "1. A pending lawsuit. 2. The jurisdiction, power, or control acquired by a court over property while a legal action is pending. 3. A notice, recorded in the chain of title to real property, required or permitted in some jurisdictions to warn all persons that certain property is the subject matter of litigation, and that any interests acquired during the pendency of the suit are subject to its outcome."

BLACK'S LAW DICTIONARY 950 (8th ed.2004). Its essence, then, is one of notice to an otherwise unknowing party.

*Lis pendens* has no specific separate existence apart from its basic function to advise a person who seeks to acquire an

interest in property subject to a *lis pendens* that he will be bound by the outcome of the noticed litigation.

*Greenpoint Mortgage Funding,* 390 Md. at 221–22, 888 A.2d at 303–04. Therefore, although we conclude that the Maryland doctrine of *lis pendens* may be applicable to condemnation actions generally, the doctrine of *lis pendens* does not provide a substantive bar to the MNCPPC's participation as a party defendant in the Town's condemnation action here. Rather, the proper application of the doctrine of *lis pendens* in the present case creates " 'a priority in favor of the [Town], which, if the [Town ultimately] succeeds on the merits of the claim, relates back to the date of the filing of the complaint' " and, thus, preserves for the Town " 'the opportunity to have a[n equity] relating back to the date of the filing of the complaint.' " *DeShields,* 338 Md. at 435, 659 A.2d at 306 (citation omitted); *see DeShields,* 338 Md. at 435, 659 A.2d at 306 ("A '*lis pendens* is a general notice of an equity to all the world,' not notice of an actual lien." (quoting *Applegarth v. Russell,* 25 Md. 317, 323 (1866))).

### 3.

In one of the few cases in which we have addressed whether a person seeking intervention is so situated that the disposition of the action, as a practical matter, may impair or impede the person's ability to protect his/her/its interest, *Chapman v. Kamara,* 356 Md. 426, 739 A.2d 387 (1999), we resolved that the person seeking intervention, the Washington Metropolitan Area Transit Authority ("WMATA"), was so situated that the circuit court permitted properly the WMATA's intervention in the initial "friendly suit" action [32]. The standard that we adopted from the Court of Special Appeals's opinion in that case was whether "the disposition of the action would at least potentially impair the applicant's ability to protect its interest." *Chapman,* 356 Md. at 443, 739 A.2d at 396.

---

**32.** The initial action "was characterized as a 'friendly suit,' filed to effectuate a settlement of remaining claims" under the insurance policy of the owner of the van and stepmother of the driver in a one-car accident. *Chapman,* 356 Md. at 430, 739 A.2d at 389.

In *Chapman,* we affirmed the circuit court's conclusion that the WMATA was entitled to intervene in an action, stemming from a fatal one-car accident, for damages sought by the parents of multiple passenger-victims against the estate of the allegedly negligent driver.[33] *Chapman,* 356 Md. at 430, 445, 739 A.2d at 389, 397. The WMATA sought to intervene because the parent of the driver of the vehicle, who was appointed personal representative of the driver's estate, filed a separate action against the WMATA alleging that a WMATA bus negligently contributed to the accident. *Chapman,* 356 Md. at 431, 739 A.2d at 390. The WMATA caused that separate action to be removed to the United States District Court for the District of Maryland. *Chapman,* 356 Md. at 432, 739 A.2d at 390. In the litigation remaining in the circuit court, however, the same parent who filed the separate action against the WMATA agreed to a consent judgment to settle the claims of other passengers. The consent judgment contained a stipulation that the driver of the vehicle was negligent. *Chapman,* 356 Md. at 431–32, 739 A.2d at 390.

The defendants in the circuit court action then filed a motion to vacate the consent judgment, alleging lack of personal jurisdiction and defective service of process. *Chapman,* 356 Md. at 432, 739 A.2d at 390. Because the plaintiffs did not oppose that motion, the WMATA sought to intervene as a matter of right to oppose the motion. *See Chapman,* 356 Md. at 432–33, 739 A.2d at 390. The WMATA argued that it had a sufficient interest in opposing the motion to vacate to justify intervention because the consent judgment stipulation implied the driver's negligence, and such negligence would establish contributory negligence as a bar to the action for negligence against the WMATA then pending in the federal court. *Chapman,* 356 Md. at 433, 443–45, 739 A.2d at 390, 396–97. We agreed with the WMATA, and found that because "resolution of the motion to vacate has a direct effect on WMATA's position in the subsequent federal lawsuit," the WMATA was

---

**33.** The driver eventually died from the injuries he sustained in the accident. *Chapman,* 356 Md. at 430, 739 A.2d at 398.

so situated that disposition of the matter pending in the circuit court, as a practical matter, may impair or impede its ability to protect its interest. *Chapman,* 356 Md. at 445, 739 A.2d at 397.

 The MNCPPC has at least as strong a position here, if not stronger, than that of the WMATA in *Chapman.* The disposition of the Town's condemnation action against Toll potentially would impair the MNCPPC's ability to protect its interest, albeit a contingent one, in the LOS Parcel arising from the subdivision process, whether viewed in light of the shelf life of the plan approval or the language of the Deed of Dedication. In *Chapman,* we found the WMATA's position relative to the action pending in the circuit court sufficient to justify the WMATA's intervention because of the collateral estoppel implications the parties' positions in the circuit court action would have created for the action against the WMATA in the federal court. By seeking intervention in the circuit court action to try to ensure that the parties involved in that action did not change their stipulated position regarding the driver's negligence, the WMATA sought to preserve the full defense it potentially had in the federal action where it was the defendant. Even if the motion to vacate the consent judgment in the circuit court suit was granted, however, the WMATA nonetheless could proceed to trial in the federal court on the merits of the negligence claim against it.

The MNCPPC is seeking to defend, more so than the WMATA was in *Chapman,* a direct interest in the outcome of the condemnation action by the Town against Toll. The Planning Board's approval of the preliminary subdivision plan, including Condition 15 requiring Toll to dedicate the LOS Parcel to the MNCPPC, was the result of several years of negotiation that preceded that action. Notably, the negotiating and planning process, as discussed in the approval, included participation by at least the Planning Board, representatives of the Town, and Toll. As far as the record and the litigants' briefs reveal to us, neither the Town nor any other party to the subdivision proceedings opposed or challenged

the Planning Board's requirement in its 11 July 2005 approval that Toll dedicate the LOS Parcel to the MNCPPC, until the Town Council adopted its Resolution 2005–06 on 6 September 2005 authorizing initiation of the condemnation action. Because the Town participated in the Planning Board approval process, there was no indication to anyone involved, including the MNCPPC, that the Town desired to pre-empt dedication of the LOS Parcel to the MNCPPC until the unilateral action by the Town. Thus, the MNCPPC had no other opportunity or forum to oppose or otherwise resolve the Town's action, other than its ability to participate in the Town's condemnation action against Toll and the LOS Parcel. Given these circumstances, we find that "the disposition of the action would at least potentially impair the [MNCPPC's] ability to protect its interest" in this matter.

4.

"In determining an adequacy of representation issue ..., one's attention must necessarily be directed to a comparison of the interest asserted by the intervention applicant with that of each existing party." *Md. Radiological Soc'y*, 285 Md. at 390, 402 A.2d at 911. "The burden of showing that existing representation may be inadequate is a minimal one." *Citizens Coordinating Comm.*, 276 Md. at 714, 351 A.2d at 139. Even though interests are not shown to be adverse, "such a showing is not necessary to the conclusion that existing representation *may* be inadequate." *Citizens Coordinating Comm.*, 276 Md. at 714, 351 A.2d at 139 (citing *Nuesse v. Camp*, 385 F.2d 694, 703 (D.C.Cir.1967)). Further, "[i]t is not necessary that there be a positive showing of inadequacy of representation in order to intervene. It is sufficient that the representation may be inadequate." *Stewart v. Tuli*, 82 Md.App. 726, 733, 573 A.2d 109, 112 (1990).

In *Md. Radiological Soc'y*, we adopted the "interest-analysis" test for determining whether the lack of adequate representation requirement has been met. The cascading test to be applied is: 1) if the proposed intervenor's interest is not represented or advocated to any degree by an existing party,

or if the existing parties all have interests which are adverse to those of the proposed intervenor, the intervenor should be permitted to intervene; 2) if the proposed intervenor's interest is similar, but not identical, to that of an existing party, "a *discriminating* judgment is required on the circumstances of the particular case, but [the proposed intervenor] ordinarily should be allowed to intervene unless it is clear that the party will provide adequate representation for the absentee"; 3) if the interest of an existing party and the proposed intervenor are identical, or if an existing party is charged by law with representing the proposed intervenor's interest, "a compelling showing should be required to demonstrate why this representation is not adequate." *Md. Radiological Soc'y*, 285 Md. at 390–91, 402 A.2d at 911–12 (quoting 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1909, at 524 (1972)).

In the case *sub judice*, the MNCPPC sought intervention in the Town's condemnation action to defend the interest it expected to receive pursuant to Condition 15 of the approved preliminary plan of subdivision. The MNCPPC's primary aim in defending that interest was to oppose the Town's condemnation action on grounds that the action was beyond the Town's legal authority and/or an undue inhibition on the MNCPPC's authority to acquire property in the Metropolitan District for its park functions. Toll also opposed the Town's condemnation action, but its opposition was motivated by its concern that the Town's condemnation, if successful, might frustrate its development plans from moving forward based on its inability to comply with the approved preliminary plan of subdivision. As indicated by the positions taken in the dueling motions for summary judgment in the Circuit Court,[31] the main warrior in the legal opposition to the Town's action was the MNCPPC, which, at best, was supported only indirectly by Toll. Toll's motion for summary judgment adopted by reference the arguments made by the MNCPPC in its first

34. The Circuit Court entered a partial summary judgment in favor of the Town. *See supra* Part I.

motion for summary judgment challenging the Town's legal authority and public purpose for condemning the LOS Parcel. In that same motion, although Toll agreed with the MNCPPC's position that the MNCPPC may have a "governmental interest" in the LOS Parcel, Toll took the position that "no compensable property interest vested in the Commission related to the [LOS Parcel]" because Toll had not yet recorded plats of the subdivision consistent with the approved site plan. Finally, in Toll's supplemental memorandum in support of its motion for summary judgment, Toll adopted by reference the MNCPPC's second supplemental memorandum as its supplemental memorandum.

▇▇▇ Although we recognize that Toll had a strong incentive to oppose the Town's condemnation action because the condemnation, if successful, might preclude Toll, after years of investment, from being able to pursue further the development under the approved subdivision plan, the MNCPPC had its own grounds, at times in conflict with Toll's, for opposing the Town's action. Only the MNCPPC possessed the incentive to pursue those grounds of opposition in the proceedings in the Circuit Court. In light of these circumstances, we conclude that although the MNCPPC and Toll had similar, but not identical interests, in the condemnation action, the MNCPPC's interests were not adequately represented by an existing party to the action.

### C.

The Circuit Court entered a partial summary judgment on the merits of the Town's legal ability to condemn property beyond its municipal boundaries. The legal correctness of that interlocutory judgment is not presently ripe for consideration by this Court. We reverse here only the Circuit Court's denial of the MNCPPC's motion to intervene.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY DENYING THE MARYLAND–NA-TIONAL CAPITAL PARK AND PLANNING COMMIS-SION'S MOTION TO INTERVENE REVERSED; STAY**

ENTERED BY THE COURT OF SPECIAL APPEALS ON OR ABOUT 26 JUNE 2008 VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY TOWN OF WASHINGTON GROVE.